## Thomas H. Oswald *vs.* Abraham McGehee.

Where a vendee purchases property upon the faith of representations of the vendor, and not upon his own judgment; and if these representations are material, and made with or without an actual fraudulent intent, and really did mislead the purchaser, and induce him to make the bargain, relying upon them: *Held*, that the contract cannot stand.

Although a purchaser may, in such a case, by close inspection, detect a vice in a thing sold, yet if the vendor makes representations upon which he relies, and which prevent the purchaser from making a proper examination, and which prove to be unfounded, it is good ground to avoid the contract.

But in the absence of all representations of the vendor, the purchaser is held to strict diligence in examining and judging for himself; but where representations are made as to doubtful matters, material in the transaction, the purchaser may protect himself by relying on the good faith of the vendor, and in breach of that, he will not be bound by the contract.

On appeal from the district chancery court; Hon. A. B. Dawson, vice-chancellor.

The opinion of the court contains a statement of the facts of the case.

*Carnot Posey,* for appellant.

It cannot be pretended that the representations of the vendor were such as to induce McGehee to purchase, even if he made no other representations than those alleged in the bill. His mind, at the time, as the proof shows, was peculiarly sensitive and alive as to the injurious nature of coco grass, so much so that he made every inquiry in relation to its extent, and availed himself of the opportunity to examine for himself, showing that he believed the representations of no one.

Then, I say, with his expressed familiarity with coco, and his abhorrence to its existence on his premises, the disclosures of Oswald, if they were no further than those made to his (vendee's) brother, and alleged in the bill, were sufficient to deter the vendee from making the purchase, rather than an inducement for him to do so.

This case is clearer, in my estimation, in favor of the appel-

lant, than the case of *Baglehole* v. *Walters*, reported in 3 Camp. R. 154. In this case, the defendant being desirous to sell a vessel, furnished the vendee with a bill of particulars, concluding that the vessel was sold with all faults, &c. The defendant contended that there were certain secret defects in her at the time of the sale, which were known to the vendor, and which he did not disclose. Lord Ellenborough held, where a ship is sold with all faults, the seller is not liable to an action, in respect to latent defects which he knew of, without disclosing at the time of the sale, unless he used some artifice to conceal them from the purchaser. The same doctrine is adhered to in the case of *Pickering* v. *Downing*, (4 Taunt. R. 779). This case was also decided upon the sale of a ship with all faults, and the court held, "that the purchaser shall make use of his eyes and understanding to discover what faults there are." The decision of these cases is based upon the idea that where the subject of the sale is open to the inspection and examination of the buyer, it is his own folly and negligence not to examine. And Chancellor Kent, vol. 2, p. 484, says, "that the law does not go to the romantic length of giving indemnity against the consequence of indolence and folly, or a careless indifference to the ordinary and accessible means of information."

Again, "to entitle a party to rescind a contract for the sale of land, on the grounds of misrepresentation or fraud, the proof must be full, clear, and explicit. The mere concealment of a material fact, by the seller, will not vitiate such a contract, when the buyer examines for himself, and has the opportunity of judging as to the existence of the fact. Falsehood by the seller, in matters of opinion, will not vitiate it; and falsehood in matters of fact will only vitiate when the buyer has no fair opportunity of judging for himself, and relied upon the representation of the seller, or where the fact was peculiarly within the knowledge of the seller." 1 Rich. R. 101.

To rescind a contract, on account of misrepresentations, the misrepresentation must be in something in which one party puts a known confidence and trust in another. And under this head, the question will arise, whether the coco is a latent defect which cannot be discovered by ordinary diligence, or that the

vendee, by his more than ordinary diligence and critical examination, could not discover the extent of the coco at the time of the purchase. In the first place, how are we to arrive at the knowledge that one contracting party places a "known confidence and trust in another?" The circumstances surrounding the whole transaction must bring us to this knowledge.

Now what are the circumstances of the case under discussion? Oswald made known to the vendee, through his brother, that coco was to some extent on the premises. Not satisfied with this honest disclosure, the vendee, in company with his brother, — two men of discrimination and understanding, and shrewd in business, — ride over the plantation, knowing beforehand the existence of the coco; and not satisfied with this examination, they inquire of vendor again about the coco, and have a great deal of conversation about it. And not satisfied with this, they inquire of the overseer, Jeter, in relation to the coco. And not even satisfied with this, the vendee, after his brother had left, rode all over the place with vendor, and upon their return to the house, it was declared that the vendee had seen more of the place than the overseer. Now I would ask, if this is putting a known confidence and trust in the vendor?

This question is fully discussed in the case of *Halls* v. *Thompson*, 1 S. & M. R. 482, &c., wherein Chief Justice Sharkey quotes from Chancellor Kent: "That each party is bound to communicate to the other his knowledge of material facts, provided he knows the other to be ignorant of them, and they be not open and naked, or equally within each other's observation." Judge Story, the chief justice further remarks, says "that these remarks of the learned Chancellor Kent, must be taken with some qualifications, by limiting them to cases where there is an obligation to communicate facts, or where there is a peculiar relation, trust, or confidence between the parties, which will justify the presumption that there is no undue concealment." And the chief justice says that "we may readily perceive, from the remarks of both these learned authors, that this obligation ceases when each party has an opportunity of examining for himself, and undertakes to do so without relying upon the statements of the other. Then the ignorance of the facts is

Oswald *v.* McGehee.

not presumed to exist, and the confidential relation ceases, and of course the legal obligation to make disclosures also ceases. Fraud is not necessarily implied, in such cases, from concealment. When the party undertakes to examine for himself, it is evidence of a want of confidence, and a determination to rely upon his own judgment, and he is presumed to have made himself acquainted with patent defects. This same principle is enunciated by Justice Swift, in the case of *Sherwood* v. *Salmon*, 5 Day, R. 445. And the justice quotes the language of Chief Justice Holt, in the case of *Lysney* v. *Selby*, 2 Ld. Raym. R. 1118, that "if the vendor gives in a particular of the rents, and the vendee says he will trust him and inquire no further, and rely upon his particular; then, if the particular be false, an action will lie; but if the vendee will go and inquire further what the rents are, it seems that he cannot have an action, though the particular be false."

*H. F. Simrall*, for appellee.

In making the purchase of the land, McGehee relied not upon his own examination, but upon the statements made by Oswald as to the extent of this grass; that it was not at that season of the year, when a purchaser would rely upon his personal examination, and that the defendant in error was deceived in this behalf by Oswald; that at no price could he have been induced to purchase, had he known the extent of the grass, etc.

Judge Story thus states the equity doctrine: "It is a very old head of equity, that if a representation is made to another person, going to deal in a matter of interest upon the faith of that representation, the former shall make that representation good if he knows it to be false." Story, Eq. Jur. 217, § 191; 1 P. Williams, 240; 1 Vernon, 120. To justify the interposition of the rule, it is not only necessary to establish the misrepresentation, but that it is a matter of substance, important to the interests of the other party, and that it actually misled him. Whether the party thus misrepresenting a material fact, or make the assertion, without knowing it to be true or false, is wholly immaterial. For the affirmation of what one does not know or believe to be true is equally in law and morals, as un-

justifiable as the affirmation of what is known to be positively false; or even if a party innocently misrepresents a material fact by mistake, it is equally conclusive, for it operates as a surprise and imposition on the other party. Story, Eq. Jur. 218, 219, § 193; 2 Bro. Ch. Rep. 389; 9 Vesey, 21; 6 Bin. 396. The foregoing principles, says the learned commentator Story, " are so consonant to the dictates of natural justice, that it requires no argument to enforce them." Story, Eq. 219, § 194.

In *Neville* v. *Wilkinson*, 1 Bro. Ch. R. 146, Lord Thurlow said: " If a man upon a treaty for any contract, will make a false representation, by means of which he puts the party bargaining under a mistake, it is a fraud." *Halls* v. *Thompson*, 1 S. & M. 82, 83. The Chief Justice declares, that if the defect is patent, and an examination is made by the purchaser, the purchaser will be taken to have relied upon his judgment, and then adds: " It is not the mere opportunity to examine which relieves the other party from the duty to disclose, for although the opportunity exist, yet if the vendee reposes confidence in the vendor, and does not examine for himself, then the duty to disclose defects is equally obligatory, and the vendor will be held bound for all statements and all undue concealments."

In *Boyce* v. *Grundy*, 3 Peters, 211, misrepresentation was, that the land on the island containing 265 acres, was not subject to inundation except a small part easily protected; this island was part of a tract of 950 acres. Grundy, the purchaser, had seen the land. Yet the statement turning out false, he was relieved from his purchase; for he relied upon the statement of vendor, and saw the land at a season of low water, &c. In *Perkins* v. *McGarich*, the court of appeals of Tennessee say, " It is a sound principle in equity that each party to a contract is bound to disclose to the other all he knows respecting the subject-matter affecting a correct view of it, unless common observation would have furnished the information." Cook, Rep. 417.

McGehee was willing to make the purchase, if the coco grass was only on three, or even four spots; because, as he states in his bill and proves by quite all of the witnesses, these " spots" could by ditching around them, or fencing around them, have been separated from the field, prevented from spreading, and

there would be no other loss than the mere land thus covered by the grass. He went into the purchase relying upon Oswald that the grass " had this extent," " no more."

Yet when the cold subsided, the coco is found scattered over three or four hundred and fifty acres of the open land, from a few sprigs to plots of several acres, and that so close together, that the land could not be " cultivated to advantage," so as to avoid the coco. One witness counted 250 parcels of it, and got tired, and quit riding over the field. Such, too, is the nature of this grass, that if stirred by cultivation, it scatters very rapidly, soon overspreads in a thick mat the land, and renders it totally unfit for cultivation.

The examination was made by McGehee, before the frost was off the ground, when the grass could only be found (if at all) by most minute search. McGehee, too, lived in Amite county, and had no other knowledge of this plantation than that he got when he rode over it, and such as Oswald gave him; besides this he was attempting to avoid a place seriously hurt by this grass.

McGehee had a right to rely upon Oswald's statements; they were made about a " fact," of which he supposed Oswald had full and accurate knowledge, if any living man had. They were made about a " fact " that was not patent to the eye, that might not have been seen, even by the most diligent looking after. To be satisfied in relation to it, McGehee made no examination, and did not rely upon his judgment.

He was misled and deceived in a most important particular; and the damage to him has been the same, whether Oswald knowingly misrepresented, or innocently made the statement, believing it true; and it is wholly immaterial which. It was not like that class of cases where the vendor expresses an exaggerated opinion as to the value of the land, &c.

It is mainly relied upon by the counsel for appellant that Oswald made the purchase upon his own examination of the plantation; that the grass complained of, in its extent was patent, and therefore if deceived, he has deceived himself.

The court in reading over this record, especially the depositions, will be impressed with the conviction that McGehee has

been most grossly deceived in reference to the property. He most certainly would not at any price have purchased a property covered to the extent this was with the obnoxious grass, knowingly. For the testimony shows that he had got rid of one plantation to escape from the coco, that he was fully cognizant of its injurious properties, and that at the first moment that he was made acquainted with the disastrous extent to which it overspread the fields, he notified Oswald, and sought a friendly rescission of the purchase before he commenced this suit.

*C. Posey*, in reply.

It is laid down by Chitty on Contracts, (6 Am. ed. 681,) "that it is extremely difficult to advance any general principle or elementary doctrine upon the subject of frauds. Cases of fraud depend peculiarly upon the particular facts which have occurred, the relation of the parties and their means of information. On the one hand, courts of justice have endeavored to repress dishonesty; on the other hand they have required that each party shall be vigilant, and exercise a due degree of caution. It is difficult to imagine that a general misrepresentation as to value, &c., the truth of which a party has an opportunity of ascertaining, or the concealment of matter which an individual possessed of ordinary sense, vigilance, or skill, might discover, can in law constitute fraud. There can be no fraud if the bargain be merely a fair contest or trial of judgment. In all contracts each party naturally and fairly attempts to gain advantage. As in a contract of sale the vendor endeavors to extol the article, the vendee to depreciate, each exercises his own judgment, and neither party can be said to be guilty of a fraud in making bare assertions, upon which the opposite party places no reliance, and which he does not embody in his contract."

If these views of Chitty are regarded by the court, I feel satisfied that the decree of the chancellor will be reversed, the bill dismissed, and injunction dissolved; for I cannot conceive that a more complete embodiment of facts could be made to apply to these views of the learned jurist above set forth, than those embraced in the record. I also refer to U. S. Eq. Dig. 190, § 51, 52.

Mr. Justice HANDY delivered the opinion of the court.

This was a bill filed in the southern district chancery court at Natchez, by the appellee against the appellant, to enjoin the collection of a promissory note executed by the former to the latter for the purchase-money of a tract of land, and to rescind the contract, on the ground of fraudulent representations made by the vendor to the purchaser.

The bill alleges in substance, that McGehee, the complainant, purchased a cotton plantation from Oswald, lying in Wilkinson county, and, there being some apprehension that there was on the place a very injurious growth called coco grass, that Oswald represented that only two or three spots of ground were infested with it, the garden, and one or two other small spots, and suppressed the fact that it was growing throughout the greater portion of the plantation, which he knew, and induced McGehee to believe that the grass was growing nowhere else on the lands but in the spots mentioned by him; that McGehee relied on the statements in relation to extent of the coco, and made no examination with reference to that matter, and only rode over the land on the day before the purchase, with a view to examine the quality of the land, the condition and state of repair of the premises, and on that occasion coco grass could not have been discovered without very minute examination, owing to the prevalence of very cold weather in the month of January, which cut it down and rendered it imperceptible; he therefore relied on the statements of the vendor; but on the approach of spring, it appeared that nearly all the land was overspread with it, whereby the plantation was not worth as much by two thirds as it would otherwise have been; that as soon as this state of things was discovered, he applied to the vendor to rescind the contract, which he declined to do; and that he would not have made the purchase if he had been aware of the true condition of the land, and the ruinous extent to which the coco grass existed in the land; that he could have inclosed and isolated the coco, as it was represented by the vendor, but it was impossible to do so, as it really existed over nearly all the plantation.

The answer denies all the material statements of the bill, and

especially that the vendor knew of the coco overspreading the lands, and concealed the fact, or that he induced the vendee to believe that it was in only two or three spots, or that the vendee relied on his representations in making the purchase. On the contrary, he avers that the vendee and his brother made a full and close examination, and that the vendor informed him' that the coco was in three or four places, and might be in others unknown to the vendor. He denies that at the time of the sale the plantation was less valuable on account of the coco, and also denies that the vendee made but one examination; and states, that after he had made an examination with his brother, he made another full and minute examination with the vendor, and judged for himself in making the purchase.

Much testimony was taken by both parties upon the points in dispute.

On the part of the appellee, it was proved by Edward McGehee that he was privy to the purchase, and accompanied the appellee when he rode over the land, which was in the month of January, 1852, during a period of very cold weather, which cut down the coco, so that it could not have been discovered except upon a very minute examination; that they did not discover it, the object of the examination being to view the general character of the place, its general surface, how much worn, &c.; that Oswald told witness that there was coco in the garden and on one of the negro patches, and it might be in some other spot, but if so he did not know it; he left the impression on witness' mind that it was confined to the places mentioned; that the purchaser relied on the statements of Oswald as to the coco, and not on his own examination, and he and witness, who was aiding him in making the purchase, were deceived by the statements of Oswald; that one half of the plantation proved to be scattered over with coco, which would in a few years render it valueless; that this grass is ruinous to a cotton plantation, and the appellee would not have purchased it at any price with a knowledge of the prevalence of the grass upon it, as he had recently sold a plantation on that account; that upon the discovery of the coco in the spring of 1852, the appellee proposed to Oswald to rescind the sale for that reason,

when Oswald said he did not know that coco was on so many parts of the plantation when he made the sale; the witness further stated that Oswald could not have visited the place frequently for two or three years past without knowing the extent of the coco; that McGehee purchased the property for a full and fair price, as if no coco was upon it.

Young proves that the greater part of the land, about two thirds, was overspread with it, and that from its appearance in the spring of 1852, Oswald must have seen its extent when he visited the place in 1851.

McLane and Richardson, residing in the neighborhood, testify to the same effect, and that it was generally known in the neighborhood that coco was on the place; that Oswald resides five miles from it, and was in the habit of visiting it frequently before the sale, and he could not have rode over it and examined it without seeing it where it was growing. McLane states that it was scattered promiscuously over the plantation in the spring of 1852, and that it diminished the value of the property by two thirds.

Richardson testifies that he told Edward McGehee of the existence of coco on the place and its extent, a few days after the purchase, and went at his request to point it out, but that the weather was then and had been so cold that it had been killed down, and he could not then perceive it, though he examined the place where he had seen it the previous summer. He states that it could not have been discovered in riding over the place in January, 1852.

It appears that the purchaser resided at a considerable distance from the place before the purchase.

On the part of the appellant, it was proved by Jeter that he was overseer for Oswald, and present when the appellee and his brother Edward McGehee came to make the purchase; that Oswald told them the coco was in three or four places, and perhaps more; that the two McGehees rode over the plantation by themselves, and Edward McGehee then left, and the appellant and A. McGehee rode over it again, and there was further conversation between them about the coco, and Oswald said that he did not regard the coco, but ploughed through it, and'

stated to appellee that he (McGehee) knew more about the place then than the overseer; that Oswald made no concealment as to the coco. He states that the coco could be seen at the time they rode over the place, and that he saw a considerable quantity of it in places; that the severe cold weather was after this time. He states that if all the land containing coco had been put together, it would not have made more than fifteen acres; but it. was much scattered, and would probably cover fifty acres.

H. M. Smith states that he was agent for Oswald in 1851, and visited this plantation and rode over it twice; saw coco in three places, and expects it could have been found in other places, from the fact that it had been ploughed through; could discover it in summer in riding over the place; cold weather kills the tops in winter, but it can be easily distinguished from other grass; it may, however, be so covered over with other grass as not to be seen in riding over the land; that what he noticed of the coco when he rode over the place, could not have spread over half the plantation by the time of the sale, but does not intend to say that it existed only in the places where he noticed it. He states that if coco was scattered over half the plantation, it would be worthless.

Paxter was overseer on the place from 1849 to October, 1851; there were three or four patches of coco in 1851, about the dwelling-house, yard, and garden, the furthest not extending more than one hundred yards from the dwelling-house; there were not more than ten solid acres of it at that time. He states that it can be easily discovered in the winter; it was notorious in the neighborhood that coco was upon the place.

Woods and Sims state that it can be detected in the winter by examination by one riding over the land. Sims visited the place in the summer of 1851, in Oswald's absence, and at his request; saw coco in a large patch, about a hundred yards through, but noticed no more; but the way it was worked, it would in a short time ruin the plantation. It can be distinguished in winter by one acquainted with it.

On the final hearing, the chancellor decreed a rescission of the sale; and from that decree this appeal is prosecuted.

This case depends principally upon the facts, the principles of law applicable to it in any point of view being well settled.

The evidence sufficiently shows that the purchase was made by the appellee upon the faith of the representations of the vendor, and not upon his own judgment. If these representations were material, and were made either with or without an actual fraudulent intent, and really did mislead the purchaser and induce him to make the bargain, relying upon them, the contract cannot stand. Story's Eq. Jur. § 191–193; *Hazard* v. *Irwin*, 18 Pick. 95; *Halls* v. *Thompson*, 1 S. & M. 443. Let us, then, examine the extent of the representations, and the circumstances under which they were made.

It appears, that pending the bargain, the vendor stated to McGehee that there was coco "in the garden and in one of his negro men's patches, and that it might be in some other spot, but he did not know it;" and the purchase was thereupon made without examination as to the coco, in reliance upon this statement, the impression created by it being that the grass was confined to the two places mentioned. This is the account of the representations deposed to by Edward McGehee, who was a party to the transaction and was aiding his brother in making the purchase, and must be presumed to have a more accurate knowledge and recollection of what transpired than the overseer, who merely casually heard what took place; and doubtless this account is true, for the witness states that he acted upon it in advising the purchase.

There can be no doubt, from the evidence, that this grass extended over a very large portion of the plantation. And here the question arises, whether the appellant was aware of the extent of it beyond the points he mentioned; for if he was ignorant of it, his representations were not such as to justify the purchaser in acting upon them beyond the places specified, although the impression were conveyed to him that it did not extend beyond the places mentioned. It is also clear that if he knew that it extended beyond the points stated by him, he was guilty of a false representation in law in stating that "it might be in some other spot, but he did not know it."

This point is not free from doubt upon the facts stated by

the witnesses. It appears by the testimony that the vendor re-sided about five miles from the plantation in controversy and had cultivated it for several years before the sale, during which time the coco grass was upon it and he knew it; that it had during that time been ploughed through in cultivating the plantation, which would inevitably cause it to spread over other parts of the land than where it first appeared; that he was in the habit of going to the place frequently, and could not have rode over and examined the plantation without seeing it where it was growing. Four witnesses on the part of the vendee state, that from the great extent to which it appeared spread over the land shortly after the sale, the vendee must have known of it at the time of the sale. The depositions for the appellant do not go to show a substantially different result. The overseer on the place in 1851, states that there were three or four patches about the dwelling-house, yard, and garden in 1851, extending probably to ten acres at that time. In the same year, Smith saw it in three places on the plantation, and expects it could have been found in other places from the fact that it had been ploughed through, and Jeter states that the appellant told Mc-Gehee that it was in three or four places, and perhaps more.

In regard to the statements of this witness, there is a discrepancy between them and the witnesses for the appellee in several material respects; as to the coco being perceptible in riding over the plantation at the time of the sale; as to the coldness of the weather at that time, and also as to the extent to which the appellant stated the coco to exist on the place. As to this last particular, it is not probable that McGehee would have purchased the plantation if it had been admitted by the appellant that this grass prevailed to an indefinite extent, he having recently sold a plantation to get rid of the same nuisance; nor is it at all probable that he would have made the purchase if the coco had easily been observed when he rode over the land. But this witness proves that it was much scattered over the place, and would probably embrace fifty acres at the time of the sale.

From the testimony, we are constrained to come to the conclusion that the appellant must have been aware of the exist-

Oswald *v.* McGehee.

ence of the coco beyond the extent stated by him to the appellee. He is shown to be a shrewd and attentive man to his business, and it would be beyond the bounds of all probability that such a man could be ignorant of the condition of his property, infested with such a pest as that here complained of, the rapid spread and ruinous effects of which are shown to have been well known and dreaded by the community in which he lived. Nor is it less improbable that the appellee, having just sold a plantation for the same cause, could have purchased another liable to the same grievance, without assurances to remove his fears or a personal examination; and we think the evidence shows that he did not make the latter.

It is insisted, in behalf of the appellant, that the existence of the coco was a *patent vice* in the property, and that the purchaser was bound to take notice of it.

This is met by the evidence which shows that it was at least doubtful whether the grass was perceptible at the time. The preponderance of the proof goes to establish, that owing to the great severity of the cold at that particular season, the coco could not have been detected without a very close and minute examination. Other witnesses state, that generally it may be distinguished from other grass in the winter season; but they do not refer specially to this season, which is shown by witnesses of standing and intelligence to have been unusually cold. It appears that, although the appellee was acquainted with the nature of this grass, yet having no reason to suppose that it extended further than was represented by the appellant, and knowing that its further spread could be prevented by ditching and isolating the spots where it prevailed, he made no particular examination with reference to the coco. From all the testimony it cannot be said that the prevalence of the coco was so obvious to the senses as to destroy the legal effect of the representations made by the appellant in regard to it, and to hold the purchaser bound under such doubtful circumstances, on the ground of gross neglect, when he acted upon the assurances of the vendor. The rule in such case is, that, although the purchaser may by close inspection detect a vice in the thing sold, yet if the vendor makes representations upon which he relies,

and which prevent him from making a proper examination and which prove to be unfounded, it is good ground to avoid the contract. In the absence of all representations of the vendor, the purchaser is held to strict diligence in examining and judging for himself; but where representations are made as to doubtful matters, material in the transaction, the purchaser may protect himself by relying on the good faith of the vendor, and in breach of that, he will not be bound by the contract. *Halls* v. *Thompson*, 1 S. & M. 482.

In view of all the circumstances of the case, we are of opinion that the decree is correct; and it is, therefore, affirmed.