Vicksburg & Meridian R. R. Co. *v.* L. A. Ragsdale.

1. Common carriers — obligation of.—Where property is delivered to a carrier, the law implies a contract that it shall be delivered at the place of destination within a reasonable time. Nothing relieves from this obligation to deliver, except the act of God, the public enemy, the act or conduct of the owner, or a special agreement limiting the common-law duty.

2. SAME — SAME — REASONABLE TIME. — The law does not attempt to fix what is reasonable time. Each case must be referred to its own peculiar circumstances, having regard to mode of conveyance, nature of goods, season of the year, character of the weather, and the ordinary facilities for transportation, under the control of the carrier.

3. SAME —WHAT WILL EXCUSE DELAY. — Temporary interruptions or obstructions which could not, with ordinary prudence, be provided against, excuse delay. but do not absolve from duty to carry and deliver as soon as it becomes practicable.

4. SAME -- SAME. — If the company has a reasonable equipment for all ordinary purposes of business, and the delay is occasioned by an unusual press of business, but the carrying is done with reasonable expedition under the circumstances, the carrier is not responsible for the delay, nor will the carrier be responsible if delay occurred from an accident not amounting to an inevitable casualty, if due care and diligence have been exercised.

5. SAME — COMPANY NOT BOUND TO INCUR EXTRAORDINARY EXPENSE. — A carrier is not bound to incur extraordinary expense to procure a means specially to transport a particular article, if it has facilities for doing so ordinarily, and a contingency occurs which could not fairly be anticipated when the contract was made.

6. DAMAGES — PLEADING. — Such damages as may be presumed necessarily to result from the breach complained of need not be stated, but if other special damages are claimed, they must be stated.

7. MEASURE OF DAMAGES FOR BREACH OF CONTRACT. — The cardinal principle in reference to damages is that the party in default shall make full and complete satisfaction.

8. SAME — SPECULATIVE. PROFITS. — Speculative profits, to be made out by calculation on paper, are not allowable. Damages, to be allowed, must be reasonably certain.

9. SAME — OBLIGATION OF PARTY SUBJECT TO INJURY FROM BREACH OF CONTRACT TO REDUCE DAMAGES. — The party subject to injury from a breach of contract is under obligation to make reasonable exertion to reduce his damages as much as practicable. If, through negligence or willfulness, he allows the damages to be unnecessarily enhanced, the increased loss should justly fall on him.

10. SAME — DIFFERENCE IN LIABILITY AS TO PARTICULAR CASES. — If the goods delivered to a carrier for transportation are for re-sale, and so known to him, if guilty of negligent delay, he is chargeable with the enhanced price, at the place of delivery, less his charges of freight. When not for sale, but to serve a special purpose in business, this rule often would be not adequate to determine damages.

11. SAME — NO FIXED UNIVERSAL RULE — CERTAIN RULES WELL SETTLED. — It is not possible to declare a fixed rule for assessing damages for many contracts. This much may be accepted as well settled: 1st. The proximate and natural consequences of the breach must always be considered; 2d. Such consequences, as, from the nature and subject-matter of the contract, may be reasonably deemed to have been in the contemplation of the parties, at the time it was entered into; 3d. Damages, which may fairly be supposed not to have been the necessary and natural sequence of the breach, shall not be recovered, unless by the terms of the agreement, or by direct notice, they are

brought within the expectation of the parties; 4th. Loss of profits in business cannot be allowed, unless the data of estimation are so definite and certain that they can be ascertained reasonably by calculation, and then the party in fault must have had notice, either from the nature of the contract itself, or by explanation of the circumstances, at the time the contract was made, that such damages would ensue from non-performance; 5th. If the contract is made with reference to embarking in a new business, the speculative profits which might be supposed to arise, but which were defeated, because of a breach of contract, which delayed the business, cannot be looked to as an element of damages; 6th. If the delay is in the transportation of machinery, to be applied to a special use, and that is known to the carrier, he is responsible for such damages as are fairly attributable to the delay, *e. g.*, such as the value of the use of the machinery, to be tested by its rental price, or other approximate means; the expenses of idle hands, etc.; 7th. The party injured by the delay must not remain supine and inactive, but should make reasonable exertions to help himself, and thereby reduce his losses and diminish the responsibility of the party in default to him.

ERROR to circuit court of Lauderdale county.   LEACHMAN, J.

The opinion of the court contains a sufficient statement of the facts of the case to show the application of the legal principles and rules enunciated by the court, and the briefs of counsel contain the principles of the instructions given and refused.   Any further statement of the case is deemed unnecessary and improper.

*S. A. D. Steele*, for plaintiff in error.

The first instruction affirms, that if the property was taken to the depot, and deposited there with the knowledge of defendants, this was a delivery. This might be a delivery under some circumstances ; but, as applicable to the facts of this case, we deny the proposition in the most emphatic terms.   It was in proof that when application was made to the agent to deliver the boiler, he refused to receive it, on account of the office being closed in consequence of the press of freight, and the difficulty of crossing Big Black, and that Crutcher, the agent of plaintiff to ship the boiler, was permitted to deposit it in the freight yard, as a mere accommodation to him, and at his own risk.   This, then, was no delivery, unless the road was bound to receive it

without regard to their ability to ship it, which we deny. Angell on Carriers, p. 108, § 125, and note.

But this instruction is subject to a more fatal objection still. It affirms that it was the duty of the road to deliver this freight in reasonable time, and that from this duty (to deliver in a reasonable time) nothing could excuse them but the act of God, or the public enemy, or a special contract. We submit that there is not an authority to be found, where it is held that an accident will not excuse the non-delivery in time, if the goods are ultimately delivered, and the carrier used due diligence and is guilty of no negligence, the rule for loss of freight and to deliver, being founded on an entirely different ground. His liability in the first case can only be excused from the act of God, etc., while an accident not amounting to the act of God will excuse in the other. 2 Redfield, 178, and notes ; ib. 180 ; 2 Pars. on Cont. 185 ; Hadley v. Clark, 8 T. R. 266 ; Angell on Carriers, p. 256, § 289, note ; ib. 252, § 283, note ; Wibert v. New York and Erie Railroad, 12 N. Y. 245.

The seventh instruction asked for the defendant is, "that the railroad was not bound to use extraordinary exertions, or to incur extraordinary expense to overcome the act of God, such as the rising of the river." This charge was refused. 2 Redf. 181; 2 Pars. on Cont. 185; Parsons v. Hardy, 14 Wend. 215 ; Bennett v. Byram & Co., 38 Miss. 21.

The eighth instruction, and also one that is not numbered, were on the question of punitive damages. The action was *assumpsit* for breach of contract, and we insist that punitive damages cannot be recovered. We hold that, in this action, and under the facts in this case, these charges should have been given, as a guide to the jury on the question of damages, and that it was error to have refused them. This is particularly the case in view of the instructions given for the plaintiff, which were calculated to mislead the jury unless they were instructed specially on the point.

The ninth instruction was refused. This was on the weight to be given an interested witness. The plaintiff was

contradicted on several material points, and we hold that the ninth charge announces the law correctly, and should have been given.

The fifth plea presents the issue, whether or not the boiler was received under a special contract, to be delivered as soon as it could be crossed over Big Black river, on the pontoon bridge. The evidence of Crutcher and Rockwell fully sustain the theory of the plea. Crutcher was the agent of the plaintiff to receive and forward the boiler, and when he received it, he attempted to have it forwarded at once, but owing to the condition of the road, the press of freight, and the impossibility to cross it over Big Black river, the agent refused to receive it; but agreed, as it was so heavy, and difficult, and expensive to move, that he might deposit it in the freight yard, at his own risk, and that, as soon as it could be crossed over the river, he would receive and ship it; and the agent did not consider that he had received it until he loaded it on the cars, and forwarded it, about the first of April. Crutcher being the special friend of the plaintiff, after this sought the superintendent of transportation, and endeavored to get him to receive it, but he declined for the same reasons. Crutcher then had it taken to the freight yard and deposited at his own risk, to be shipped as soon as it could be crossed on the pontoon. This is the substance of the defendant's testimony on this point. Afterward Crutcher saw Ragsdale, whom he informed of what he had done, who paid the charges, and made no objection to what he had done in the matter, and he understood him to sanction it; and that he, Ragsdale, still left the matter in the hands of his firm.

We insist that Crutcher, Hazlett & Co. were the agents of Ragsdale, for the shipment of this freight, and that they were clothed with all the power and authority of Ragsdale to do this particular act, and that he is bound by their acts. But, if there is any doubt on this point, his afterward ratifying what had been done will bind him.

Against this testimony is only opposed the testimony of

Ragsdale himself, who is directly interested in the result of the suit, and this goes to his credit. But independent of his interest, the positive testimony of Crutcher and Rockwell, sustained by the other facts in the case, and the testimony of Theobold, Smith, Cully, Chamberlain and Clingan on the point that the boiler could not have been crossed earlier, and by the further fact that the engine was received and receipted for, and that the boiler was not receipted for, must prevail against the testimony of the plaintiff unsupported, and in fact contradicted by the other testimony, and the facts of the case.

As to the ability of the road to cross the boiler, we have the testimony of Crutcher, Theobold, Smith, Cully, Chamberlain and Clingan, all declaring that it was impossible to cross it with the means at their command, or in their power to procure, at least without extraordinary exertions and expense ; and indeed we think that Theobold did use extraordinary exertions.

On the other hand, Ragsdale says, that in February and March the river was very low, and Wilson, who was at work on the tressel, was of opinion that it was within its banks, but he frankly admits that the other witnesses, whose business it was to cross freights, had a better opportunity to know the condition of the water than himself. This is so reasonable that it has but to be suggested to be seen and understood. His business was at his tresseling, to which his attention was called, while their attention was directed to the water and the pontoon every hour of the day, and in fact, the press was so great that they were probably crossing freight constantly, and as they had to lay and keep the pontoon in position, they knew the length of the bridge, and hence the width of the water. This knowledge Major Theobold would peculiarly have, as he had the whole responsibility. He says that the water was never less than eight hundred feet, from the 1st of February until the boiler was crossed, and that it was six hundred feet wide when it was crossed. Smith and Cully say it was never off the second

table, which, according to their estimate, was seven hundred and fifty feet. They estimate the width of the river seventy-five feet, the first table seventy-five yards, and the second table one hundred and fifty yards, thus making seven hundred and fifty feet; but in giving the width of the water in feet, they say it was six hundred feet — they give only an opinion as to distances, while Major Theobold speaks from a knowledge of the length of the bridge. This testimony is so clear and satisfactory that, it seems to us, there can be no hesitancy in the mind of the court, to declare that the jury, on the issue under the fifth plea, totally disregarded the evidence and the instructions, for the instructions fully sustain the theory of the defense on this point.

But, under the general issue, the verdict should have been for the defendants. It is clear that the boiler could not have been delivered earlier than it was, in consequence of an accident over which defendants had no control to prevent, and which they could not overcome without extraordinary expense and exertion; and that they had ample means to cross any other freight except this boiler; and that no other freight was delayed, and that the boiler could have been crossed on it at any but the most unusual stage of water, and was, in fact, crossed on this bridge when the water was 600 feet wide. We hold, that this rise in the river being the act of God, the defendants were only required to use due diligence, and not required to use extraordinary exertions or to incur extra expense to cross a single article of freight; and that they were justified in refusing to receive the boiler as freight ready for shipment on account of the press of business and the difficulty of crossing Big Black. To sustain this view we refer to the authorities already cited.

We are aware that the authorities are conflicting on the questions of damages, but we insist that the better rule is, that the measure of damages is the difference in the value of the freight at the time it should have been and at the time it was delivered. In other words, that the damages is

the injury sustained, and not speculative profits that might have been realized. This was the doctrine of the earlier English and American cases. This doctrine was held on principle by Judge Story in very strong terms. Sedg. on Damages, 69.

There is some conflict in the late American and English authorities on this point, referring to a case in 9 Exch., of Hadley v. Baxendale, decided in 1853, to sustain a different rule. In this case, Alderson, B.,. places the right to recover profits on the ground that both parties understood, at the time, that the carrier undertook to be responsible for the profits. From the facts of this case it appears that the carriers were informed that the mill was stopped in consequence of the breaking of the shaft, and a note was made to hurry up the delivery, and that the delivery was delayed by negligence. Hadley v. Baxendale, 9 Exch. 343. We submit, that it will be found, by a reference to the authorities, that this case does not sustain the proposition for which it is quoted. We do not deny the proposition that where the carrier is notified of the expected profits, and contracts in view of them, so that they enter into the contract, they may be liable ; but, we insist that there is as much in this case going to show a knowledge on the part of the carrier, as there is in the case at bar, and yet, the finding of the jury in that case, on this point, was set aside. We submit on this point, that while there is some conflict in the authorities, the weight of the authorities is against the recovery of profits or speculative damages.

As to the amount of damages proven, we hold that the value of the engine was not proven, and that there was nothing on which the jury could estimate damages. Ragsdale states that the engine, mill, house, freights and expenses cost him $7,000, and that after running it for some time, at a loss, he sold the engine for $4,000. But in this estimate he includes the cost of building the house, and of the hands employed, and it is impossible that the jury could have had any basis on which to estimate the difference

between the value at the time it should have been, and at the time it was delivered.

That the continued overflow is the " act of God," to overcome which the company was not bound to use " extraordinary exertions, or incur extraordinary expense." Bennett v. Byram & Co., 38 Miss. 21; Briddon v. G. N. R. R., 4 H. & N. 487; Parsons v. Hardy, 14 Wend. 215; 2 Redf. 181; 2 Pars. on Cont. 185; Hadley v. Clark, 8 T. R. 265; Angell on Carriers, p. 256, § 289.

*W. & J. R. Yerger,* on same side.

1. The rule of the common law makes common carriers insurers of the freight delivered to their charge and of its safe delivery to the consignee. Nothing relieves them from this liability except the act of God or the public enemy, or a special contract by which their liability is limited. 12 Smedes & Marsh. 599; 1 ib. 279.

But in this case, a suit for damages resulting from delay, the rule of law is different. In the absence of a special contract a common carrier is under no liability to deliver freight at any given time, but only to carry safely and to deliver in a reasonable time. His liability is only that of an ordinary bailee for reward where both parties are to be benefited by the bailment, and he is only required to use ordinary diligence, and only liable for ordinary neglect. 1 Jones (N. C.), 211; Great Northern Railway v. Taylor, Law Rep., 1 C. P. 385; S. C., 12 Jur. N. S. 372; 2 Redf. on Railways, 180; Wibert v. New York and Erie Railway, 19 Barb. 36; S. C., 2 Kern. 245; Sipfold v. S. C. Railway, 7 Rich. 409; 28 S. J. 57; 32 S. T. 94; 20 Wis. 594. If the immediate cause of the delay is the act of God, though the carrier may remotely have contributed to it, he is not liable. 20 Penn. St. 171. The obligation upon common carriers by which they become insurers does not extend to the time of delivery. Bond v. Mer. S. B. Co., 1 Jones (N. C.), 211; Parsons v. Hardy, 14 Wend. 215; Story on Bailments, 545 *a.* See, also,

14 Ill. 156 ; 22 Barb. 278 ; 7 Rich. (S. C.) 409 ; ib. 190 ; 14 Ill. 156.

The contract of a common carrier, in reference to the delivery of goods, is that he will deliver them at the point of destination in a reasonable time, according to the usual course of business with all convenient dispatch. 2 Redf. on Rail. 178, § 189 ; Raphael v. Pickford, 5 M. & G. 551 ; 6 McLean, 296 ; Hill v. Humphries, 5 M. &. S. 123; Favor v. Philbrick, 5 M. & W. 358 ; Story on Bail., § 545 *a*. And what is a reasonable time is a question of fact depending on the circumstances of the case. Nettles v. S. C. R. R., 7 Rich. 190 ; ib. 409 ; Conger v. Hudson River R. R., 6 Duer, 375 ; 18 Law & Eq. 557.

2. Even if it were conceded that the company was in default in delaying to deliver the engine in this case, and were liable for refusing to transport it over the Big Black during the high water, the damages which have been allowed under the instructions of the court are excessive. Ragsdale states in his testimony, that there were three modes by which he might have shipped the engine and machinery in the first instance to Meridian : By way of Vicksburg, over the railroad of defendants, or to New Orleans, and from that point to Jackson, and from that point over the railroad of defendants ; or to Mobile and from that point by the Mobile and Ohio Railroad. After the engine reached Vicksburg, if the defendants, from any cause, refused to carry it, Ragsdale could have transported it from Vicksburg to New Orleans, and from that point by way of Jackson to Meridian ; or from Vicksburg to Mobile, and from thence by way of the Mobile and Ohio railroad to Meridian And, if it was important that he should have received the engine at any given time, it was his duty to have adopted one of the other routes, charging the defendants with the extra cost and not have folded his arms in quiet inaction, and then seek to hold the defendants liable for all the anticipated profits which he would have made if the defendants had promptly delivered the engine to him. Sedg. on

Dam. 92, 373, 379, *et seq.*; Miller v. Mor. Church, 7 Greenl. 51; Davis v. Fish, 1 Iowa, 407; Sober v. Dawson, 7 Pick. 284; Thomas v. Shattuck, 2 Metc. 615; Harden v. Dalton, 1 Carr. & P. 181; O'Connor v. Foster 10 Watts, 418; 19 Barb. 36; 24 Wend. 304; 21 ib. 457; 11 East, 232; 2 Denio, 610; 3 Gray, 92; 1 Cal. 333; 38 English Law & Eq. 335; 17 Mo. 290.

In regard to contracts, a defendant is only liable for those damages which each party may be fairly supposed to have contemplated at the time they entered into the agreement, as likely to result from it.

The early English and American courts generally concurred in denying profits on any part of the damages to be compensated, whether in cases of contracts or torts. Sedg. on Dam. 57–69, and cases cited. The modern rule in this country seems to have established the rule in reference to profits to be this, that a party may recover, as a part of the damages sustained by him, those profits or advantages which are the direct and immediate fruits of the contract entered into between the parties, which are part and parcel of the contract itself, entering into and constituting a part of its very elements, something stipulated for, and which are presumed to have been taken into consideration and deliberated upon before the contract was made and formed.

But profits or gains derivable from a contract, which are contingent and speculative in their nature, and dependent upon the fluctuations of the markets and the chances of business, such as the supposed successful operation the party might have made if he had not been prevented from realizing the proceeds of the contract at the time stipulated, are not to be taken into the estimate of damages. For, besides the uncertain and contingent issue of such an operation, in itself considered, it has no legal or necessary connection with the stipulations between the parties, and cannot, therefore, be presumed to have entered into their considerations at the time of the contract. Opinion of

Nelson, C. J., in Masterton v. Mayor of Brooklyn, 7 Hill, 62; see Fox v. Harding, 7 Cush. 516.

On the subject of gains and profits to be recovered as damages, there has not been entire unanimity in the American courts, but the great preponderance of authority, and the reasons which should control in such cases, is decidedly in favor of the rule laid down in the well-considered and leading case of Homer v. Wood, 16 Barb. 386; Horen & Co. v. Goodel et al., Disn. 23; 11 Barb. 371; 2 Greenl. on Ev., § 256, and note 5, and § 261; 1 Sneed, 381; 33 Vt. 75; 21 ib. 289; Reynolds v. Cox, 11 Ind. 262; 18 Mo. 369; 33 Conn. 513; 1 Gall. 56; 3 Humph. 56. We think it will be found, in every case where profits have been allowed in a collateral enterprise, as damages for the non-performance of an existing contract, on which such collateral enterprise was dependent, and such profits were matters almost of actual calculation, and not merely speculative and contingent. The case of Hadley v. Baxendale, 9 Exch. 343, was that of a mill in England which had been long established, with a fixed and daily amount of custom, almost unvarying, which loss of said custom could be calculated almost to a dollar; and so with regard to the other cases in which profits have been allowed as damages. These are all unlike the present case, in which there is no basis of calculation of profits, and where all is pure matter of speculation.

*W. P. Harris,* for defendant in error.

It is not sufficient to show that the court below erred; it must appear very clearly that the party complaining was substantially injured by the error; otherwise, this court would find itself compelled to listen again and again, in the same cause, to discussions upon points which exerted no influence on the result.

In this case, it is obvious under the general issue, with special pleas held good, the defendant presented, in proof, the identical matters set up in the rejected pleas, and, in the form of instructions obtained, the enunciation of every

proposition which he sought to obtain by his pleas. The error, if any, was cured in the court below.

It is every day's observation in the courts, that a perfectly good exception to the ruling of the court is taken, and yet rendered useless by being cured in the progress of the trial. This rational principle is as applicable to pleading as to evidence. Wilkinson v. Cook, 44 Miss. 367, and the authorities cited.

The instructions taken together present the true legal propositions. Looking to the evidence, it is apparent that the real issue was that of negligence or no negligence; that is, did the defendants use reasonable diligence? Could they, by the exercise of due diligence, have delivered the machinery at the time appointed or earlier than it was delivered? No one can read the evidence and the instructions without perceiving that this was the chief inquiry, indeed the only inquiry as to the question whether the plaintiff had a cause of action. The instructions on both sides must be taken as one connected utterance by the court. One instruction, too broad, is qualified by another which restricts it. Let us suppose that the court, under the old rule, which admitted of a general charge on the whole case, and it appeared in that charge that it started out with a proposition too broad, but that in the course of it the error was distinctly corrected, and taking it altogether, the case in point of law was fairly presented, we could not surely assign for error here the first broad proposition announced.

Let us put the instructions on both sides together into a connected charge. It will stand thus: "The rule as to common carriers is, that nothing but the act of God, the public enemy, or, as it is better expressed, nothing but inevitable accident will excuse him for a failure to perform his contract. This general rule, however, has this qualification: if the breach of the contract or the failure of duty consists in mere delay in the delivery of freight, and not the loss of it, then the carrier will be excused if he shows

that he used all due diligence in efforts to deliver in time."
This proposition is actually conceded in one of the instruc-
tions for the plaintiff, and when we read those given for the
defendant, we are struck by the broad and liberal basis on
which the court placed the defense, and the repeated and
distinct modifications of the first general proposition.

If instructions too broad, or bad altogether, are corrected,
the error is cured.   Hanks v. Neal, 44 Miss. 212; M. & C.
R. R. v. Whitfield, ib. 466 ; Head v. State, ib. 731, and
authorities there cited.

Let us not be carried away by citations showing that
"contradictory instructions constitute error."   It depends
altogether upon the way the proposition stands in the cause.
Here there is not contraction, but qualification of one prop-
osition by another, and the peculiar manner of the qualifi-
cation is the effect of the law which denies to the court the
power to make a general charge of the law to the jury.   The
court, having before it the charges asked on both sides,
finds an instruction asked by one side too broad or too nar-
row, or otherwise incorrect, but also sees in other instructions
for the same party, or in instructions asked by the other,
that the error is corrected, and the proper meaning of the
legal propositions propounded evolved in the series of
charges asked, and gives the charges altogether.   The court
will not alter a charge which is made to have its proper
weight by other charges, and this effect is as well brought
about by the instructions drawn by the counsel as by the
mouth of the judge.

As to the matter of fact on the question of diligence, the
testimony of Ragsdale is conclusive.   This court cannot
undertake to say about what degree of credit should be
attached to the testimony of this witness.   The jury has
decided that he is worthy of credit, and from this decision
there is no appeal.   The jury had the right to take his state-
ment against a "cloud of witnesses."   He proves negli-
gence.   In addition to this, negligence is shown by other
witnesses and facts which do not admit of dispute.   The

machinery was crossed over the pontoon bridge when the
river was 600 feet wide, and Theobold says that between the
time of the arrival of the machinery and the time of cross-
ing the machinery, the river had been at that stage "several
times." It was, therefore, practicable to have crossed it
"several times." Again, the defendants having induced
Ragsdale to ship the machinery by their road, were bound
to receive it and make every reasonable effort to transport
it. They allowed the boiler to remain at Vicksburg a
month or more before they sent it to the river or gave Theo-
bold notice that it was to be crossed, and without consulting
him as to the practicability of crossing it. If they had sent
it forward to the river promptly, it would have enabled
Theobold to take advantage of the first fall in the river, of
the first of the several times when it is shown to have been
practicable to cross it. The evidence shows that the com-
pany had an excess of freight of a lighter kind, and this
being more profitable than the transportation of the
unwieldly boiler, Ragsdale was sacrificed to interests of
the defendants.

No objection was made to the evidence offered to show the
extent of the damages, and accordingly it was shown that an
engineer was employed at high wages, and buildings erected
at great expense. The want of saw-mills at Meridian dur-
ing the period the machinery was delayed, the great demand
for lumber, its price during that time, the expense of run-
ning the mill, the product of such a mill if worked with
reasonable diligence, and upon all this the jury were asked
to fix the compensation for the injury occasioned by the
inexcusable delay in the delivery of the boiler. Undoubt-
edly all these matters should have been weighed by the
jury. Mr. Sedgwick has well remarked, that the difficul-
ties which surround the subject of the measure of damages
is traceable in a great degree to the efforts on the part of the
courts to adopt rules for all cases, and take the subject from
the jury that the case should be submitted to the jury and
every actual loss considered by them under proper direc-

tions, and that the jury should be allowed to make a just allowance for compensation, taking the whole matter into view. It will not do to say profits are not to be considered, that consequential damages are not to be taken into this account, nor will it do to say that every actual loss, direct or proximate, should be compensated.

The case we have is governed by no conventional rule. It is not even to be governed by the rule as to delay in the delivery of merchandise. It belongs to a class of cases in which the courts have arrived at some general rules as to the measure of damages admitted to be sound as far as they go. Delay in the delivery or erection of machinery or the repair of machinery.

The proposition which has universal acceptance is that a party who occasions loss by a breach of duty or contract must make good the loss. In the language of an English judge the injured party ought to be placed, as near as can be, where performance of the contract would have placed him. There is no instruction given in stronger terms.

To these general propositions there are admitted qualifications: 1st. Where the damages are not the necessary and usual consequence of the injury, but grow out of a peculiar condition of things, or situation of the injured party, then it must appear that the offending party knew or was admonished of these circumstances, because, says the English court, in Hadley v. Baxendale, if the carrier had been told of the circumstances and the use for which the machinery was wanted, so that he might see the consequences of delay, he would have made a special contract to limit his liability, or at all events have seen the necessity of diligence. In that case the delay was in the delivery of part of the machinery of a steam mill, and the court held that the loss of the profits of the mill during the delay could not be estimated, because the carrier did not know that stoppage of the mill would result from his delay. Hadley v. Baxendale, 9 Exch. 341; Sedg. 81. The intimation is clear that if the carrier had been duly notified that the mill could not run without

the part he undertook to deliver, that the loss of the profits during the period of inexcusable delay would have properly entered into the estimate.

Hadley v. Baxendale has not been overruled. It is sound law, and Mr. Sedgwick has inserted it in his text by the side of Griffin v. Collier, 16 N. Y. 489, and the two cases are leading cases. Mr. Sedgwick has approved the Louisiana rule, which is but a deduction from the principle of the case, in 9 Exch. (Sedg.) 67, 79, 80. See Hinckley v. Beckwith, 17 Wis. 413. The American leading cases differ from the English in not holding it to be necessary to show that there was actual notice to the carrier of the consequences likely to follow delay in the delivery, but it was in a case where the party contracting to deliver of necessity knew that the delay suspended operations. As in this case, the carrier must have known that the engine could not operate without the boiler. It may, therefore, be taken as a sound rule, that, where the damages are the direct result of the delay, they are to be estimated in all cases, with the qualification that, if there be unusual and peculiar circumstances, which would enhance the damages, the carrier should be admonished of their existence.

Thus we have one qualification of the leading proposition; the next is that stated in Griffin v. Collier, which is that where you undertake to make the loss of profit as a measure of damages, or other consequential damages are estimated, there must be certainty that the damage resulted from the breach of contract, and reasonable certainty as to the extent of the loss. There must be some known standard, approximating to certainty, as to the loss. The American cases of delay in delivering machinery, whereby the operation of a mill is suspended or prevented, give damages for the value of the use of the mill, the expense of preparations, etc. Griffin v. Colver, 16 N. Y.; Priestley v. North. Ind. & Chicago R. R. Co., 26 Ill. 205; Davis v. Cin., Ham. & Dayton R. R. Co., 1 Desn. (Supreme Court of Cinn.) 23; several cases in the Indiana and Illinois reports. The value

of the use of the saw-mill during the period of inexcusable delay, together with the actual expenditures of money occasioned directly by the delay, are to be estimated.

How are we to determine the value of the use of a saw-mill at Meridian for a period of three or four months? In New York and the west, where mills are abundant, and the leasing of mills is a common thing, the price of such leases are governed by a standard hardly less certain than that which governs the lease of land and the hire of labor. At Meridian, however, such a thing as leasing a saw-mill, I suppose, rarely occurs, and witnesses and jurors would be at a loss to say what it would cost to rent a saw-mill, with lumber at a high price, for three or four months. The value of the use of a mill is, at least, the value of the net product, and no man undertakes to lease a farm or a mill without basing his estimates upon this product. In the case in hand this was consistent with principle, and, in fact, merely adopting the real standard of value, there being no market value fixed by the business of the country. We do not know what standard or measure of damages the jury actually took. The evidence admitted of their adopting the standard of actual loss by the decline in the value of mills. What cost $7,000 Ragsdale had to sell at $4,000, estimating actual expenditures, and the value of the use tested by the product which might reasonably be anticipated.

Here is a case in which an enterprise has been defeated. Hence a case where a man has embarked money, devoted his energies and his time in a project which offered rational inducements, and afforded ground for rational hope, he is thwarted and disappointed by the negligence of the defendant. It is plain he sustained a loss, a heavy loss, by this negligence. He estimated it at $12,000. The jury gave him one-fourth of that sum. His actual, ascertained loss, that is, the cost of what he sold, as compared with the price he got, amounted to $3,000, and if we estimate expenditures, and the value of the lease of the mill, it will

reach that sum. That he is entitled to compensation for these losses is plain, and the law which would condemn a verdict for $3,000 would condemn a verdict for $1,000, nay, for $100. The court must, if it upsets this verdict, give a reason for it. If it was wrong, wherein was it wrong? If the wrong measure has been used, give the right measure. When this is attempted, the court will find it very difficult to fix upon any standard which will be more satisfactory than that which the jury seem to have adopted. The suggestion that Ragsdale should have shipped his boiler by way of New Orleans, is met by the fact that the defendants invited him to send it by their road, and kept him constantly fed with the hope that it would be sent forward.

SIMRALL, J. :

This is a suit by Ragsdale against the Vicksburg and Meridian Railroad Company, as common carriers, for a failure to transport from Vicksburg to Meridian, a boiler, part of the machinery of a steam saw-mill, within a reasonable time. The count is upon the duty (or implied contract) of the carrier to perform his undertaking with due dispatch, and alleges for breach a failure to perform. We have been greatly assisted by counsel, with elaborate argument at the bar, and with copious briefs. When property is delivered to a carrier the law implies a contract, that it shall be safely, and within a reasonable time, carried to, and delivered at, the place of destination. Nothing relieves from the obligation to deliver, except the act of God, the public enemy, the act, or conduct of the owner, or a special agreement limiting the common-law duty, if the time is not named. The implication arises from the receipt of the property for transportation ; that it shall be done with due dispatch, or within a reasonable time. The law does not attempt to fix by rule, what is "a reasonable time." Each case is referred to its own peculiar circumstances, an account being taken of the mode of conveyance, the nature of the goods, the season of the year, the character of the weather, and the

ordinary facilities for transportation under the control of the carrier. Temporary interruptions or obstructions, which could not with ordinary prudence be provided against, excuse "delay;" but do not absolve from the duty to carry and deliver as soon as it becomes practicable. These principles are well settled, and have received a full recognition in Bennett v. Byram, 38 Miss. 20. There the transportation was impeded in mid-voyage by low water. Not being able to prosecute the voyage, the carrier stored the goods' at Gainesville in June. In August the owner hauled the lighter goods to Aberdeen. In the following January the river became navigable and the heavier articles were forwarded by steamboat. On these facts it was held, that the carrier was justified in suspending his voyage and storing the goods; that the owner could not recover for the expense of the hauling, because by accepting the goods he discharged the carrier from further responsibility with respect to them; as to the delay, that was referable to inevitable accident. Ang. on Carr., §§ 330, 331.

The principles which measure the duties and responsibilities of common carriers prevailed before steamboats and railways came into use. With very few modifications they have been applied to these modern facilities of commerce.

The questions are reduced to these: 1st. Was the railroad company excused in the delay of carrying and making delivery by an extraordinary event, and did it exert reasonable dispatch in all the circumstances? 2d. If the default of the company was established, is the verdict of the jury excessive? and, lastly, did the court, by granting or withholding instructions, contribute to a wrong result?

It was not controverted at the argument that the destruction of the bridge over the Big Black, and the unusual floods in that stream from about the first of January until June, was such a hindrance to the operations of the railroad as necessarily to produce delay, more or less, in its business of transportation.

For the plaintiff it was maintained that the company, by

the use of energy and diligence, could have crossed the boiler over the river, on the pontoon bridge, or the steamboat, or by other means. The evidence is clear and full that these accommodations were ample for all ordinary purposes, in any stage of the water, were sufficient to cross any freight that had been offered, except the boiler, and would answer for that when the water did not exceed 600 feet in width, and that the boiler was the only freight which was not promptly crossed, and that was held back on account of its great weight (8,500 pounds).

If the company have a reasonable equipment for all ordinary purposes, and the delay be occasioned by an unusual press of business, but the carrying is done with reasonable expedition under the circumstances, then it is not responsible for the delay. 2 Redf. on Rail. 163, § 2; Peet v. Ch. & N. W. R. R. Co., 20 Wis. 596. Nor will the carrier be responsible if the goods are retarded by an accident not amounting to an inevitable casualty, if due care and diligence have been used. Story on Bail., § 545; 14 Wend. 215; 20 Wis. 596.

Nor was this company bound to incur extraordinary expenses to procure a means specially to cross this boiler, in view of the fact that it had facilities for doing so in ordinary high water, and such contingency may not fairly have been anticipated when the contract was made; and in view of the further fact that neither party could have foreseen or anticipated a stage of water higher, and remaining up longer, than was usual in that stream.

The damages alleged in the declaration is "depreciation in value and the loss of the opportunity of selling;" privation of "gains and profits," and expenses in endeavoring to obtain the goods. The rule is, that such damages as may be presumed necessarily to result from the breach of contract need not be stated, but if other special damages are claimed they must be specifically stated. 1 Chitty's Pl. 386; De Forest v. Leet, 16 Johns. 122.

On a very large class of contracts, there is no serious

difficulty in assessing the damages for a breach, according to a definite rule. As where goods are for sale at the place where the carrier undertakes to deliver them, there the measure is the value at the place of delivery, as compared with the place of receipt by the carrier. If they have been unreasonably delayed, the time when they ought to have been delivered is, perhaps, the criterion. Much depends, too, upon the character of the property, as whether liable to waste and deterioration by time. The cardinal principle is that the party in default shall make full and complete satisfaction. The difficulty arises in determining what elements that contribute to the injury shall be taken into the account. What is the line which separates damages that naturally and necessarily flow from a breach, from those which are more remote and speculative? A party may fairly be held to account for the ordinary results of his act. It is upon this idea that compensation for private wrongs is computed. If more than this is claimed, a special reason or ground for it must be shown. (We are not speaking of those cases of bad faith, etc., where damages may be allowed.) There is nothing in this case which warrants such damages. It is not pretended that the delay was wanton, or was dictated by a gross dereliction of duty. At the most, it amounts to an error of judgment, as to the ability of the company's agents to put the boiler across the Big Black before it was done. Ragsdale, therefore, was only entitled to be fully and adequately compensated for his losses, computed upon proper principles. The boiler was a part of the motive power of a saw-mill, intended to be erected by the plaintiff. The delay in its transportation and delivery entailed a loss upon him, but to what extent, and upon what basis is the calculation to be made? No well-considered case can be found in the books, where speculative profits, to be made out by calculations upon paper, are allowable. In Masterton v. Mayor of Brooklyn, the profit which would have been derived from another contract, existing at the making of the one in suit, was

allowed. 7 Hill (N. Y.), 62. Here there were data for a safe estimate. The reason for discarding expected profits as an element of loss is, that the party charged is not presumed to have made his contract with reference to such results. But where they are such, as he ought to have contemplated as a reasonable and probable result of the breach, they may be considered. But then the anticipated profits should be such as are capable of reasonable certainty.

In Abbott v. Gatch, 13 Md. 333, the bargain was to build a flouring mill by a specified time, on failure to complete within the time the plaintiff claimed for the profits which he would have realized from the business. This was repudiated as too uncertain and contingent, and the rent or value of the use, as of rental, was adopted, not because it was a certain criterion, but for the reason that it was approximately just. Mr. Powell, in his treaties on contracts, chapter 21, states the general principle thus : " Such damages as are incidental to and directly caused by the breach, and may reasonably be presumed to have entered into the contemplation of the parties, and not speculative profits or accidental or consequential losses." To this formula may be reduced the case of Hadley v. Baxendale, 9 Exch. 341, and Hamilton v. Mc Pherson, 28 N. Y. 76. In the last case the carrier was attempted to be held for injury caused to grain by heating after he had received the notice to forward it. He was guilty of negligence in the delay. The " damage " was not incidental to and caused by the delay. The direct cause was " want of care in the warehouse;" he was, therefore, not liable for injury by the heating. In Palmer and Robertson v. Ohio and Mississippi R. R. Co., the effort was to secure the profits which would have been made in building Sipton locomotives, which were to be paid for as completed ; five were constructed and delivered, and the contractor suspended work because he was not paid for those finished. He failed because no case, said the court, could be found to that effect, " unless the plaintiff had been prevented from going on with his work, by the positive affirmative act of the other party, or

unless the other party has neglected to do some act without which the plaintiff could not, in the nature of things, go on with his contract, as where the place for the erection of the house is not pointed out, or materials not furnished as agreed to be." Ashe v. De Roset, 5 N. C. 301. Rice was burnt in a mill where it had been deposited to be hulled; the miller was guilty of negligence in delaying the work, but was not responsible for the value of the rice, because the contingency of its destruction by fire was not in the con- templation of the parties. It was not a natural and inci- dental consequence of a breach of the contract.

In all the cases we have examined, if extraordinary special damages, such as the loss of profits in a business, are allowed, they must have been incidental to the breach, in such sense as to have been contemplated by the parties at the time the contract was made. Thus, in Smead v. Foord, 1 Ellis & Ellis, 602, in the queen's bench, the delay was in the de- livery of a threshing machine, with the knowledge that it was needed to thresh grain in the field. The wheat was in- jured by rain, and a further loss was sustained by a fall in the market. It was held that damage by rain might fairly be supposed to have been contemplated, but that a decline in the market was too remote and contingent. Compton, J., said that the rule in Hadley v. Baxendale "must not be extended." In Wilson v. Newport Dock Co., 1 Law Rep. 177, Martin, B., who participated in the judgment of Hadley v. Baxendale, observing on the case, said, that while the observations of Alderson, B., were proper to be taken into consideration, in the great majority of cases performance was expected, and damages to arise from a breach seldom or never enter into the contemplation of parties. In Gee v. Liverpool and York R. R. Co., 3 L. T. N. S. 322, it was said by Baron Wilde, that a most excellent attempt had been made in Hadley v. Baxendale to lay down a general rule of practice, but that in many cases of contracts there was no fixed rule, and as yet it had been impossible to find one. In that case the "delay" was in the delivery of some bales of

cotton at Oldham, in consequence the mill was idle, and
workmen unemployed for a time. The immediate need of
the cotton was not communicated to the carrier, at Liver-
pool, but was communicated on non-arrival in proper time.
It was held, that for the lack of notice at the time of de-
livery to the carrier, he could not be liable for stoppage of
work, and wages of operatives. So in Great Western R. R.
Co. v. Redmayne, 1 Law (C. P.) 329. The plaintiff lost the
sale of his goods through the negligent delay of the carrier,
who had received no notice of the object for which the goods
were sent, this special damage was disallowed. In McKnight
v. Ratcliffe, 44 Penn. St., a stream was obstructed which
caused the overflow of plaintiff's coal mine, depriving him of
its use for four months. The supposed profits which might
have been made were rejected as measures of damages."

In Cooper v. Young, 22 Ga. 272, delay was made in the
delivery of coal to the plaintiff, who was a smelter of iron
out of crude ore. His works were suspended for a time,
and the question was, whether he could recover for the loss
of profits which he would have made, or the enhanced cost
of transportation by some other mode. It was determined
by the court, that, as the carrier had the cheapest mode of
transportation, the price agreed upon as usual by that
mode, and the terms upon which others would carry by
other modes, also, expenses of wages of hands during
necessary suspension until the plaintiff could, by other
means, supply himself, were the proper elements in fixing
damages. A party subject to injury from breach of con-
tract is under duty to make reasonable exertions to reduce
his damages as much as practicable. If he, through negli-
gence or willfulness, allows the damages to be unnecessarily
enhanced, the increased loss should justly fall upon him-
self. Freedlander v. Pugh, Slocum & Co., 43 Miss. 117,
and cases cited ; 21 Wend. 461 ; 17 Pick. 284. Where the
goods are for resale in the market of destination, and so
known to the carrier, the carrier, if guilty of negligent
delay, is chargeable with the enhanced price at the place

of delivery, less his charges for freight.   O'Connor v. Foster, 10 Watts, 418; Sangamon & Morgan Co. R. R. v. Henry, 14 Ill. 156.   But where the goods are not to be put upon the market for sale, but are to serve a specific purpose in a business, this rule may not be, and often would not be, adequate to determine the damages.   To delay in the carrying of machinery, in Green, Admr., v. Mann, 11 ib. 613, it was said, the value of the use of the machinery was the criterion.   In Prestby v. North. Ind. & Chicago R. R. Co., 26 ib. 207, a "reasonable rent" was indicated.   It was added, if the carrier had been notified for what purpose the machinery was designed, and its necessity, as that hands were under pay and idle, loss of promised custom out of which profits would have been made, these circumstances might have been considered of.

We have pursued this investigation to the point of tedium, in order to see the practical application of the rules for assessing damages.   We are constrained to concur in the observation of Barons Martin and Wilde, that a splendid effort was made, in Hadley v. Baxendale, to state the principle in such form as to provide for the more difficult cases, but subsequent experience and discussions have tended to demonstrate that it is not possible, in the nature of things, to declare a fixed rule for many contracts.   This much may be accepted as well settled : 1st. The proximate and natural consequences of the breach must always be considered ; 2d. Such consequences as from the nature and subject-matter of the contract may be reasonably deemed to have been in the contemplation of the parties at the time it was entered into ; 3d. Damages, which fairly may be supposed not to have been the necessary and natural sequence of the breach, shall not be recovered unless, by the terms of the agreement, or by direct notice, they are brought within the expectation of the parties ; 4th. Losses of profits in a business cannot be allowed, unless the data of estimation are so definite and certain that they can be ascertained reasonably by calculation, and then the party in fault must have had notice,

either from the nature of the contract itself, or by explanation of the circumstances at the time the contract was made, that such damages would ensue from non-performance ; 5th. If the contract is made with reference to embarking in a new business (such as sawing lumber for the market), the speculative profits which might be supposed to arise, but which were defeated because of a breach of contract which delayed the business, cannot be looked to as an element of damages. These are dependent largely upon other contingencies, skill, industry, energy, the market, supply of material, keeping machinery in order, loss of time by weather, or breakage of machinery ; 6th. If the delay is in the transportation of machinery, to be applied to a special use, and that is known to the carrier, he is responsible for such damages as are fairly attributable to the delay, such as the value of the use of the machinery, to be tested by its rental price, or other approximate means ; the expenses of idle hands, the loss of gain on work contracted to be done for another person, if such work could have been done if the machinery had been delivered, and the gain thereby definitely ascertained in proper time ; 7th. The party injured by the delay must not remain supine and inactive, but should make reasonable exertions to help himself, and thereby reduce his losses, and diminish the responsibility of the party in default to him.

The difficulty experienced by the courts is not so much in the abstract principles, but in their application to special circumstances, so multiform and various in the transactions of actual life. The constituents of the "injury," as enumerated by Ragdsale, are these : That lumber from February to June was high and in demand, worth from $30 to $35 per thousand ; money was also plenty. After June lumber depreciated about $10 per thousand, money became tight and scarce ; besides this he had need of lumber for building purposes. He had made arrangements to run the mill night and day, whereby his profits would have been over $100 per day. He had hired an engineer at $6 per day, for

four months, who was idle half the time. He expended $50 in looking after the boiler. The cost of his engine, machinery, mill-house, etc., was $7,000 ; after operating a short time, at a loss, he sold the entire establishment for $4,000. From these circumstances the jury estimated the damages at $3,000. It is perhaps impossible to analyze the premises upon which the jury proceeded. It is manifest that they ought not to have allowed for the supposed profits, which Ragsdale might have made. These were purely contingent and speculative, resting for their fulfillment upon the uncertainty of the market, the ability to supply logs, the skillful management of the machinery and business generally. They are repudiated in all the carefully considered cases we have examined. Nor does the price realized for the mill property supply a proper data. The value at the time of sale was influenced by the demand for such property, the profits in its use, and the condition in which the property itself was, as whether injured or not ; chiefly, perhaps, in the market value of the product of such a sawmill, at the time and place. It is because of the uncertainties and fluctuations of such standards, that the courts have found them unreliable and uncertain, and are, therefore, supposed not to have been contemplated by the parties at the making of the contract. The contractor, who engaged to supply the farmer with a threshing machine by a certain day, knowing the use it was to be put to, was properly chargeable for the injury to the wheat in the husks from rain, because, according to the economy of nature, the grain was exposed to that risk by his negligence. But not for a depreciation of the market value of grain. If Ragsdale were compensated for the value of the use of such machinery, while deprived of it by the negligence of the carrier, and also for the expense of idle hands, awaiting its arrival, and costs incurred in looking after it, and injuries to it because of delay, about all the circumstances are taken into the estimate upon which courts and juries can securely rely. There was no sufficient testimony before the

jury, as to the value of the use of such property, to enable them to act intelligently on that point.

At the time that Ragsdale had his interview with the servants of the company in December at Vicksburg, about their road as one of the routes for transporting his engine and fixtures, there was no serious obstruction from high water in the Big Black. But on the first of February, when his engine and boiler arrived at Vicksburg, and was offered to the company, the water in that stream was very high. Mr. Crutcher (a member of the firm of Crutcher, Hazlett & Co. the consignees) states "that on the first of February when he applied to the clerk, at the company's depot, to see about shipping the boiler to Meridian, he refused to receive it on account of the difficulty of crossing it over Big Black. That he saw Lawrence (who was transportation agent or master) who also refused to receive it for the same reason." "He saw the clerk again who permitted him to leave the boiler in the yard, for convenience, to be forwarded as soon as it could be crossed over the Big Black." "That the witness saw Ragsdale in Vicksburg the last of February, and informed him of the condition upon which the company had received the boiler for transportation," "and that he, witness, understood Ragsdale to assent to this arrangement." On the arrival of the machinery from St. Louis the consignees had, by letter, informed Ragsdale of the difficulty of crossing the Big Black." These facts are worthy of serious consideration on the question of damages. They put the plaintiff in possession of the knowledge that the company's servants, charged with transportation, did not believe, when the freight was offered, that they could transport the boiler to Meridian, and that they had accepted it to be transported, when it became practicable. Three or more weeks afterward he is advised of this, and acquiesces in the arrangement that had been made. In view of the uncertainty of the transportation, and of his great need of the machinery, ought he not, in order to lessen his own losses and lighten the burden that might be upon the carrier, to have adopted one of the

two other modes of transportation, either via New Orleans and Mobile, or via Columbus, Ky., and the Mobile and Ohio Railroad; either of which were open to him. The iron manufacturer, in the case reported in 22 Ga., must suspend his furnaces unless he received coal from Chattanooga; there was none to be had elsewhere. Ragsdale could not start his mill without a boiler. The former was not permitted to close his works and charge the carrier with the profits he might have made. But he ought to have availed of a more expensive mode of transportation, and held the carrier for the difference. So Ragsdale could have sent his boiler by either of the routes indicated, and charged the company with the difference; for, thereby, he would greatly have shortened the time that he was deprived of the loss. These facts should be considered by the jury, in fixing the time that the company should pay for the privation of the use of the machinery, especially so, if the carrier was acting in good faith, and delayed the transportation for the reason that he believed that it was impracticable to cross the swollen stream.

Was the jury correctly guided by the court, and can the plaintiff in error predicate that he has been injured by erroneous instructions? If the verdict is clearly right upon the testimony, and substantial justice has been attained, the appellate court will not remand the cause for misconception and misstatement of the law in the instructions, for the right result has been attained, in despite of the error of the court.

The first instruction granted for the plaintiff lays down the rule as to the responsibility of a carrier for a non-delivery, but not the rule for a "delay" in making delivery caused by negligence.

The second instruction is so vague and indefinite, when applied to the circumstances of this case, that it furnishes no guide at all, or turns them loose to frame such standards and rules for the measurement of damages as they chose to adopt. Considered in connection with the third, the jury were at liberty to give such contingent gains as the plaintiff

might have made by a successful running of his mill, day and night, without loss of time from bad weather, disorder of machinery, or other contingency.

The seventh instruction may have misled the jury as to the amount and character of exertion the carrier should have made in overcoming the obstruction of crossing the Big Black. The refusal of the court to grant the defendant's eighth prayer of instructions, to wit: "that the plaintiff, for the non-delivery of freight in a reasonable time, is not entitled to speculative damages" still further tends to the impression that the jury may have been influenced by wrong views of the law on this point.

There is a want of harmony and consistency between the instructions granted for the respective parties on the question of "negligent delay;" besides, the court refused the eighth prayer of the defendant, which would have had the effect to limit and modify the second and third instructions given for the plaintiff, and to have made the rulings on this point more in harmony with the law.

We have not thought it worth while to consider the decisions of the court on the pleadings. The matters contained in the pleas were admissible under the general issue. In truth, all the testimony propounded by the defendant, all that was capable of being produced, went to the jury, and if he had the benefit of all defenses under the issues joined, and the testimony was admissible under them, no beneficial end would be answered by an examination of these decisions. We have purposely foreborne to express an opinion as to whether the railroad company was guilty of such delay in forwarding the boiler, in the special circumstances, as makes it liable to damages. It is the peculiar province of the jury to determine that question, aided by such expositions of the law by the court as will enable them to apply correct principles to the facts in evidence.

Judgment reversed, and *venire facias de novo* awarded.