## R. R. ESTELL *v.* W. G. MYERS.

1. VENDOR AND VENDEE.  *Misrepresentations.  Recoupment.*

   Where, in selling a river plantation, the vendor makes false representations as to its comparative safety from overflow, which are inducements to the vendee to purchase, the latter may recoup, in a suit by the former in chancery to enforce the security for the purchase-money, to the extent of his injury.

2. SAME.  *Character of misrepresentations.  Warranties.*

   In such a case, if the vendee, being a stranger unacquainted with the country, relies upon the declarations and assurances of the vendor, made from long residence and observation on the plantation, as to the relative and comparative danger, the points of exposure, the direction the water will take, and the securities that must be chiefly looked to, and does not trust his own observation and inexperienced judgment, such declarations, if they are material and actually mislead, may be treated as inducements to the contract, and of force as warranties, even though they were not knowingly false, or made with a fraudulent intent.

3. SAME.  *Remedies.  Time within which pursued.  Recoupment.*

   Such vendee has his election to rescind the contract, in which case he must proceed within a reasonable time after he discovers that the representations are false, or to affirm it, in which case he may sue for the deceit, or allege his damages in recoupment of the purchase-money.  His right to recoup is not prejudiced by delay, but may be exercised so long as the remedy is preserved to the vendor on his security for the purchase-money.

4. SAME.  *Bill to enforce security for purchase-money.  Recoupment.  Measure of damages.*

   If such vendee recoups in a suit in chancery by the vendor to enforce the lien for the purchase-money, he is entitled in that suit to all

the damages which he might justly recover in an action brought by him for the deceit; and the range of investigation and of evidence is as broad in the one case as the other, his rights being subject to the single limitation that he shall not have a decree against the vendor for any excess over the vendor's demand.

5. SAME.    *Items of damages and measure thereof.    Difference in value of land.*

In such a case, the vendee may recoup in damages the difference between the value of the land at the time of the purchase, if it had been as represented, and its value at that time as it was subject to overflow. To arrive at this, one way is to estimate what it would cost to put the land in the condition which the vendee expected and bargained for.    *Van Epps* v. *Harrison*, 5 Hill (N. Y.), 63.    A simpler method is, assuming as the basis that the land was of the value agreed, if of the character warranted, to estimate what depreciation in its value on account of the falsity of the vendor's representations should be deducted from the contract price.    In the latter case, the range of inquiry would include the frequency, extent and duration of the overflows, and their effect upon the crops.

6. SAME.    *Loss of crops.*

The vendee, after discovering the unfitness of the land for the purpose for which he bought it, cannot continue to plant and recover for the loss of his crops; but if, trusting to the vendor's representations, who knew the purpose for which he bought, he has planted on the land, he is entitled to recoup the deficit or partial loss of the crop by the overflow next after the purchase, reference being had to the character of the season, climatic influences, and other circumstances which affected the production.

7. SAME.    *Drowning of cattle.*

Under the same circumstances, and with like limitations, he is entitled, for the same reason, to damages sustained by the drowning of his cattle and animals by the first overflow, where he could not, by reasonable efforts, have saved them.

8. SAME.    *Other items.*

If not estimated for as part of the depreciation in the value of the plantation, the vendee is entitled to the expense of repairing fences washed away, removing drift-wood, logs and the like, so far as these injuries were caused by the overflow warranted against.

9. SAME.    *Mules which died of disease caused by the overflow.*

In such cases, the vendee would also be justly entitled to compensation for mules that die of disease, without his fault or negligence, if it shall be shown that the disease is directly to be traced to the overflow

of the plantation, rather than to atmospheric or other causes, referable to the general overflow of the country. Per SIMRALL, C. J., and TARBELL, J.

10. SAME.  *General principles and rules.*

The aggrieved party must be compensated, first, for those consequences that, according to the ordinary course of things, flow from the injury; secondly, for those effects so intimately connected with the nature and subject-matter of the contract as fairly to be deemed to have been in the contemplation of the parties; and, thirdly, damages which may not naturally and necessarily issue from the breach or fraudulent act, but which, by the terms of the agreement or direct notice, were brought within the expectation of the parties. Per SIMRALL, C. J., and TARBELL, J.

11. SAME.  *Warranty of fitness for particular use.*

If the vendor was advised of the use to which the land was to be put, and warranted its adaptability for it, he may fairly be held responsible for the damages consequent upon unfitness.

12. SAME.  *Fraud in vendor.*

If there be fraud by the vendor, the damages take a wider range than if his conduct had been fair and honest; and, in some cases, damages have been allowed to compensate for all the expenses in which the fraud has involved the vendee. Per SIMRALL, C. J., CHALMERS and CAMPBELL, JJ.

APPEAL from the Chancery Court of Bolivar County.

Hon. E. STAFFORD, Chancellor.

The case was first argued before the court composed of Simrall, C. J., and Peyton and Tarbell, JJ.

*Nugent & McWillie*, for the appellant.

1. The misrepresentation or warranty, to be actionable, must *precede* the sale, or be *concurrent therewith;* if made *subsequent* to the conclusion of the contract of sale, without some new matter of consideration between the parties, it cannot support an action. *Hogin* v. *Plympton*, 11 Pick. 97 ; *Bloss* v. *Kittridge*, 5 Vt. 28. The expression of an opinion by the vendor, as to the quality or value of his land, although the opinion is erroneous or ill-founded, will not entitle the purchaser to relief. *Curry* v. *Keyser*, 30 Ind. 214; *Drake* v. *Latham*, 50 Ill. 270. There is something more also required : the false assertions must be made with intent to defraud, the vendor must be aware of the falsity of his representation, and there must be an injury to the vendee, *Taylor* v. *Scoville*, 54 Barb.

34; *Weed* v. *Case*, 55 Barb. 534; *Marsh* v. *Falkner*, 40 N. Y. 562; *Meyer* v. *Yesser*, 32 Ind. 294; or, as stated by the court in the case of *Hammat* v. *Emerson*, 27 Maine, 308, the representation must have been false, have been fraudulently made and have occasioned damage. It must also appear that the vendee did not trust to his own knowledge or examination, but relied solely on the statement of the vendor. *Beals* v. *Olmstead*, 24 Vt. 114. If the truth could have been ascertained by ordinary vigilance, or ordinary diligence and prudence, the representations are not actionable. *Rockafellow* v. *Baker*, 41 Penn. St. 321; *Mooney* v. *Miller*, 102 Mass. 220; *Brown* v. *Castles*, 11 Cushing, 348; *Brown* v. *Leach*, 107 Mass. 364.

Does the proof show that the alleged representations were made in fact? Myers, in his cross-bill, so charges; but the answer to the cross-bill emphatically denies the allegations, and puts the appellee to the proof. This answer is evidence against Myers, and is conclusive, unless shown to be false by clear proof: doubtful evidence will not do. *Brooks* v. *Gillis*, 12 S. & M. 438; *Miller* v. *Lamar*, 43 Miss. 383; *Petrie* v. *Wright*, 6 S. & M. 647; *Moody* v. *Farr*, 6 S. & M. 100. The proof must satisfy the conscience of the Chancellor, and overcome the natural presumption of honesty and fair dealing. 1 Story Eq. Jur. § 190 *a*. The sworn answer of Estell to the cross-bill must be shown to be false by proof which is clear. *Moody* v. *Farr*, *ubi supra*.

The learned counsel then reviewed the evidence at length, contending that it failed to overturn the answer to the cross-bill, citing *Gregg* v. *Von Phul*, 1 Wall. 274; *Crockett* v. *Lashbrook*, 5 Monroe, 530; *Bank of Wilmington* v. *Wallaston*, 3 Harrington, 90; *Hicks* v. *Crane*, 17 Vt. 449; *McCabe* v. *Raney*, 32 Ind. 309; *Malloney* v. *Horan*, 49 N. Y. 111; *Continental Bank* v. *Bank of the Commonwealth*, 50 N. Y. 575, and contending that upon every principle of law, as well as sound reason, the appellee must be held bound by his letters, and not be permitted at so late a day to rest his rights upon a totally different basis.

2. Supposing the representations to have been made, what

is the measure of damages? This has been answered by our own Supreme Court in *Myers* v. *Estell*, 47 Miss. 4, 17, thus: "The same rule of damages, therefore, must be adopted as would be adopted in assessing damages in such cross-action." The case of *Goodwin* v. *Morse*, 9 Met. 278, is referred to as authority; and a consideration of that case with those of *Foster* v. *Rogers*, 27 Ala. 602, and *Milton* v. *Rowland*, 11 Ala. 732, establishes the measure of damages to be the difference between the value of the land as it *actually was*, and its value *if it had been as represented*. The price for which the property sold has nothing to do with the ascertainment of the damages. If, in consequence of false representations, the vendee agreed to pay an " extravagant price," the case was one for a rescission of the contract, and Myers should have proceeded accordingly. His election to stand to the bargain and look to his remedy in damages cannot alter the rule as prescribed. It, in fact, is the very reason for the rule.

The learned counsel then discussed the question of damages at great length upon the evidence, contending that the Chancellor reached his conclusion of $48,900 by a compromise decision; and further contended that damages did not bear interest, while the interest on the purchase-money ran on, and that thus, even if damages were sustained, little or nothing was to be taken off the principal of the debt, the interest covering it.

But the cross-bill only asks such damages as Myers sustained on account of the loss of crops, mules and the like, which the court, on exceptions taken at the time, *ruled out as being speculative*, and happily there is no law to warrant any such testimony. In *Masterton* v. *Mayor of Brooklyn*, 7 Hill, 61, Nelson, C. J., said: " It is a very easy matter to figure out large profits upon paper, but it will be found that these, in a great majority of cases, become seriously reduced when subjected to the contingencies and hazards incident to actual performance." And in the case of *The Schooner Lively*, 1 Gallison, 315, Judge Story said: " An allowance of damages upon the basis of a calculation of profits is inadmissible. . . . The subject would be involved in utter absurdity. It would be a calculation upon conjectures and not upon facts."

*W. L. Nugent*, on the same side, argued the case orally.

*Percy & Yerger*, on the same side.

1. If the defence set up was true, the appellee, by his failure to assert it for so long a time, and by his correspondence with the appellant on the subject of this debt, without hinting at the defence, has debarred himself from all claim upon a court of equity for relief. 1 Story Eq. Jur. § 203 *a;* 2 Story Eq. Jur. § 1533 *et seq.;* 2 Kent Com. 480 *et seq.;* 3 S. & M. 683; 9 S. & M. 596; 13 S. & M. 580; 44 Miss. 457.

2. At the date of this purchase the appellee was manager and half-owner of the land, had raised a large crop on the place, and gone through a high water with the Vick front levee standing. If the defects complained of were open to his observation, or if he was aware of the falsity of the representations before concluding the contract, or did not rely upon them, he cannot obtain relief. *Anderson* v. *Bennett*, 5 How. (Miss.) 165; *Anderson* v. *Lincoln*, 5 How. (Miss.) 279; *Bell* v. *Henderson*, 6 How. (Miss.) 311; *Anderson* v. *Hill*, 12 S. & M. 679; *Hall* v. *Thompson*, 1 S. & M. 443; 1 Story Eq. Jur. §§ 190–199, and notes.

3. The appellee did not have this most important warranty put in the deed, but, in childlike simplicity, relied with confidence upon the verbal representations of his vendor, to him an utter stranger. This is certainly most improbable. How does the evidence sustain the position? The appellee states that the appellant gave him unequivocal and positive assurances — upon which he relied and by which he was induced to purchase — that with the Vick front levee up the place would be safe from overflow, with the exception of a few low places. The appellant states that he gave it as *his opinion* that under such circumstances the place would be free from overflow, except in *extreme and long-continued high water*, and that he made the appellee fully acquainted with every overflow of the place for thirty years previous.

The learned counsel then reviewed the testimony, contending that the cross-bill was not sustained, and urging earnestly that the decree was manifestly erroneous, and clearly against the weight of evidence.

4. As to the measure of damages or of abatement, we respectfully submit that, even had the appellee maintained successfully the defence set up, he has utterly failed in this branch of his case. The rule as laid down in *Myers* v. *Estell*, 47 Miss. 4, is that so much by way of abatement or recoupment shall be deducted from the amount due, as the article is reduced in value by reason of the defect. How much in dollars and cents is the value of the plantation diminished by reason of its liability to overflow? When this amount is ascertained, it is to be deducted from the amount due on the notes. We submit that the court will search this record in vain for any data or any kind of testimony by which to work out this sum. Nowhere does any witness undertake to say how much this place is diminished in value.

The damage sustained by reason of loss of crops, as appears from the testimony and from Myers's letters, is purely conjectural.

By what process of reasoning the Chancellor arrived at the conclusion that the appellant was entitled to a decree for $10,000, we confess ourselves at a loss to understand. In so far as the pleadings and evidence go, it would have been equally rational to have given him a decree for any other sum, from $1,000 up to the whole amount claimed, or to have denied him any relief whatever. We defy any one to say, upon the closest, most analytical scrutiny of the testimony and pleadings, why the court below would have given the appellant $10,000 rather than any other amount. It is a purely arbitrary sum, fixed upon without reason to support it or foundation of fact. We respectfully submit, therefore, that for the reasons above assigned this court will reverse the decree of the court below.

*Harris & George*, for the appellee.

1. The learned counsel made an elaborate argument on the evidence, contending that it was proved not only that Estell had made misrepresentations, but also that he was guilty of fraud, that Myers had been grossly deceived, and was clearly entitled to damages, and that the decree of the Chancellor was right on the facts.

2. The rule in relation to damages is varying. There is no

certain formula which can be applied in all cases. The principal trouble in any particular case is whether the damages claimed are too remote. There are always certain damages which are allowable without controversy, because they are the immediate and proximate results of the injury complained of; and there are also others which, though they may be traceable to it, are yet so remote and speculative, that they are uniformly denied. There is a vast territory of debatable ground which lies between these two, and concerning which the principal controversies have arisen. In cases of breach of contract, the rule is to restrict this debatable ground, by running the line of demarcation much nearer the undisputed boundary; in cases of tort, the line tends to the other extreme. But even in cases of contract purely, the courts have been very liberal in extending the rule so as to include in the damages losses not immediately resulting from the breach. They have given not only the value of the thing lost, but also compensation for losses resulting from a failure to get the thing, and which were occasioned by being deprived of it. *Fox* v. *Harding*, 7 Cushing, 516; *Hadley* v. *Baxendale*, 9 Exch. 341–354; *Vicksburg Railroad* v. *Ragsdale*, 46 Miss. 458, 483; Sedgwick on Damages, 76. This court, in *Vicksburg Railroad* v. *Ragsdale*, above cited, says, after reviewing many cases, " This much may be accepted as settled : 1. The proximate and natural consequences of the breach must always be considered. 2. Such consequences as from the *nature and subject-matter* of the contract may be reasonably deemed to have been in the contemplation of the parties at the time it was entered into. 3. Damages, which fairly may be supposed not to have been the necessary and natural sequence of the breach, shall not be recovered, unless by the terms of the agreement, or by direct notice, they are brought within the expectation of the parties." Under these rules, in cases of breach of contract, where there is no fraud or bad faith, damages have been allowed to embrace the profits which naturally grew out of the contract. *Fox* v. *Harding*, 7 Cushing, 516; *Railroad Co.* v. *Howard*, 13 How. (U. S.) 307; *Cook* v. *Commissioners of Hamilton Co.*, 6 McLean, 612; *Coweta Falls Manufacturing Co.* v. *Rogers*, 19 Ga. 417; *Masterton* v. *Brooklyn*, 7 Hill

(N. Y.), 61; *Batchelder* v. *Sturgis*, 3 Cushing, 205. And in many other cases, the party in default has been held liable for such damages as might reasonably be supposed to have been in the contemplation of the parties, considered with reference to the nature and subject-matter of the contract, and the uses to which it was to be put. *Borradaile* v. *Brunton*, 4 E. C. L. 265; s. c. 8 Taunt. 535; *Tuckwell* v. *Lambert*, 5 Cushing, 23; *Langridge* v. *Levy*, 2 M. & W. 519; *Levy* v. *Langridge*, 4 M. & W. 337.

But we have a stronger case than damages resulting from a mere breach of contract. Our claim for damages is based upon the fraud of Estell. And all the cases agree that where there is fraud the damages are much more liberal. This rule is fully recognized in *Whitfield* v. *Whitfield*, 40 Miss. 352, and also in *Vicksburg Railroad* v. *Ragsdale*, 46 Miss. 459.

3. It is argued that we have delayed too long in making complaint, and are therefore barred. The delay, we admit, is probably too great, if we were asking for a rescission of the contract. Fraud in the making of a contract gives the party defrauded two remedies: one, to rescind the contract *in toto*, within a reasonable time; the other, to affirm the contract, and to have damages for the fraud. The waiver of the right to rescind is no waiver of the right to sue for damages, or recoup the damages, in case the party is sued. The affirmance of the contract by a failure to rescind is not an affirmance of the contract, except as it was made; viz., with the incident of fraud attached. Such an affirmance is only a consent to be bound by it, with the right which the law gives him to damages for the fraud. *Peck* v. *Brewer*, 3 Law Times Rep. 58; *Herrin* v. *Libbey*, 36 Maine, 350.

As to the general right of recoupment, see many cases cited in *Peck* v. *Brewer, ubi supra; Whitney* v. *Allaire*, 1 Comstock, 305; *Stow* v. *Yarwood*, 14 Ill. 424; *Brigham* v. *Hawley*, 17 Ill. 38; *Schuchmann* v. *Knoebel*, 27 Ill. 175; *Babcock* v. *Trice*, 18 Ill. 420; *Bates* v. *Cartwright*, 36 Ill. 518; *Lunn* v. *Gage*, 37 Ill. 19; *Wright* v. *Lattin*, 38 Ill. 293.

*J. Z. George*, on the same side, argued the case orally.

*B. F. Trimble*, on the same side.

1. The defendant has not been debarred by laches, as urged

by the complainant, from making his defence. No one is barred because he does not defend before he is sued. The authorities cited by opposing counsel were cases where the vendee sought to rescind the contract. But the case at bar is like *Myers* v. *Estell*, 47 Miss. 17, where this court held good the identical defence now set up, over the identical objections urged by the identical counsel, and supported by the identical authorities and reasons which we now have here.

2. The defendant has made out his defence on the evidence. The learned counsel then reviewed the testimony, showing that the representations were made. Myers relied in making the purchase, not on his judgment, but on these representations. A stranger in the country, unacquainted with overflows, he consulted Estell, and, in purchasing, relied on Estell's representation that, " with the levee across the Vick front up, the place will not be hurt by water." Upon the faith of these representations he bought, and he would have made neither the purchase of 1865 nor the purchase of 1866 but for them.

3. Counsel reviewed the testimony on the subject of damages, insisting that, on the whole case, Myers has more than paid Estell what his place was worth, and, were he under the law entitled to do so, he would ask for a decree against Estell for the balance.

SIMRALL, C. J., delivered the opinion of the court, then composed of Simrall, C. J., Tarbell and Chalmers, JJ.

This appeal is prosecuted from the final decree of the Chancery Court, and presents two questions: first, whether Myers established a right to recoup damages; and, secondly, if so, upon what principles shall they be assessed or estimated.

The defence is made to the bill in chancery brought by Estell to enforce the security for $40,000, the unpaid debt for a plantation and personal property thereon, sold by him to Myers, and is to the effect that at the time of the sale of the property, preceding and concurrent therewith, Estell, with the view and design to overreach, deceive and defraud Myers, falsely and fraudulently represented, that, with a certain break in the Vick front levee hooped and repaired, the land would be free from

overflow by the Mississippi River, except that in very high and long-continued floods some ten or fifteen acres of the lowest land, and not more, would be overflowed. The break was hooped and repaired early in 1866; but in 1867, while said levee was standing unbroken, more than three-fourths of all the land was overflowed, and the river rising rapidly when the levee broke, rose some two feet more thereafter, whereby the whole plantation was overflowed, and would have been inundated, if the levee had not broken. Estell knew that the plantation had been overflowed in former years, when said levee was up and unbroken, and that Myers was a stranger in the country, uninformed as to the liability of the land to overflow; yet Estell falsely and fraudulently concealed that the lands had been overflowed as aforesaid whilst the Vick front levee was up. Relying on the truth of these statements and representations, Myers purchased, in 1865, a half-interest in the plantation and stock for $31,000, all of which has been paid; and, in 1866, purchased the remaining half of the property for $40,000, payable as follows: $5,000, Feb. 1, 1867; $17,500, Feb. 1, 1868; $17,500, Feb. 1, 1869.

Myers alleges, further, that the plantation was entirely overflowed in 1867; that he made, with sixty hands, less than one hundred bales of cotton, when he ought to have made five hundred; that, by drowning, he lost one hundred and fifty head of cattle, sixty head of sheep, and two mules, worth $4,000; that his crop was greatly reduced in 1868 by the overflow, so that he only made one hundred and seventy-one bales of cotton. He estimates his damages as equal to the principal and interest of his debt. In an action at law upon the notes, between the same parties, reported in 47 Miss. 4, 15, it was held that the same defence set up in a special plea was good to the extent of the damages sustained.

We do not propose to review the testimony. The Chancellor was of opinion that the testimony proved the misrepresentations. We are not prepared to say that his conclusion is erroneous, but think that the preponderance of the evidence establishes that misrepresentations were made by Estell, which were inducements to Myers to make the purchase. These had reference to the comparative safety of the plantation from

overflow.   Being false, it is plain that Estell has been damaged, and that he may recoup from the purchase-money to the extent of his injury, though the damages should equal in amount the debt claimed.

By what rules shall the damages be estimated ?   The aggrieved party must be compensated for those consequences that, according to the ordinary course of things, or as sometimes said, "naturally," flow from the injury.   This is the primary rule, and of universal application ; for a man must be held to intend, and must be accountable for, the ordinary results of his acts.   But, secondly, we may advance a step further, and include those effects so intimately connected with the nature and subject-matter of a contract as fairly to be deemed to have been in the contemplation of the parties.   And, thirdly, damages which may not naturally and necessarily ensue from the breach, or fraudulent act, but which, by the terms of the agreement or direct notice, were brought within the expectation of the parties.   *Vicksburg Railroad* v. *Ragsdale*, 46 Miss. 458, 483, and cases there cited.

Myers, in making his purchase, was willing to assume a certain amount of risk.   He seemed to be aware that none of the alluvial lands of the Mississippi River delta were absolutely free from overflow, but that the liability of some to be submerged was greater than others.   He directed his inquiries, therefore, in reference to the property about which he was negotiating, to its relative and comparative danger from the water; the points of exposure and peril; the direction the water would take; and the securities that must be chiefly looked to.   If in these matters he relied upon the declarations and assurances of Estell, made from long residence and observation on the plantation, and did not trust to his own observation and inexperienced judgment, then the declarations and assurances may be accepted as truths, become inducements to the contract, and of force as warranties.   Nor does it matter whether such declarations were knowingly false, or were made with a fraudulent intent or not: if they were material and did actually mislead, the injury is the same. *Oswald* v. *McGehee*, 28 Miss. 340, 351.   If a party innocently misrepresents a material fact by mistake, it is equally as con-

clusive as if knowingly false ; for it operates as a surprise and imposition on the other party.   Story Eq. Jur. § 193.

In such cases, the vendee has his election to rescind or affirm the contract.   If he takes the former course, he must proceed presently, within a reasonable time after he discovers that the representations are false..   If, however, he abides by the contract, he may sue for the deceit ; or he may allege his damages in recoupment of the purchase-money.   Nor are his rights prejudiced by delay.   So long as the remedy is preserved to the vendor on his security for the purchase-money, the right remains to the vendee to recoup his damages.

It would hardly be disputed that the immediate and proximate injury sustained by Myers would be compensated by allowing him the difference in the value of the land as it actually is, compared with its value if it had been what it was represented to be.   Myers bargained for it on the predicate that it would be safe from overflow, except a few acres, — ten or fifteen, — if the Vick front levee did not break.   It was disclosed that not only the front proprietor, but also several others, on Lake Bolivar, were interested in that levee ; for, if that should give way, all of them would be submerged.   These proprietors would make common cause to keep that levee staunch and safe.   It turned out, however, that the Vick levee did not protect the plantation to the degree represented ; for the flood of 1867 submerged three fourths of the plantation from openings in the levee above that point, and was rapidly encroaching on the other fourth when the Vick levee gave way, and overflowed the whole of it.   It was shown, too, in evidence, that in former years, with the Vick levee standing, the plantation had been overflowed.

It is a much more difficult problem to ascertain the difference in the value of a plantation, because of its increased exposure to overflows, than in most other instances of false representations.   In the sale of goods by sample or warranty as to quality, the measure of damages is the difference in the value of the goods, as represented to be, and their actual value..   In *Gibson* v. *Marquis*, 29 Ala. 668, 671, the same rule was applied to land.   The defendants' plea was " that the plaintiff represented to them that said land did not overflow, and that the

defendants, relying upon said representations, were thereby induced to purchase said land;" but that "said land does overflow, and is thereby diminished in value a large amount, to wit, the sum of $800." The plea was sustained. The court remarked : " The measure of damages in such case would be the difference between the value of the tract of land as it actually was, and its value if it had been as represented."

The general principle is well illustrated by Tindal, C. J., in *Cutler* v. *Close*, 5 Carr. & Payne, 337. The subject was a heating-stove, which the plaintiff had contracted to erect in Kilburn Chapel. The learned judge said, that " If the stove in question is altogether incompetent and unfit for the purpose," " the defendant is not bound to pay ; " but that if it could be made good at reasonable expense, the defendant should have such reduction as would be required to make it complete. In *Houston* v. *Young*, 7 Ind. 200, the employer, who was sued for wages, was permitted to recoup damages, for the failure of the tenant or employé to cultivate the corn in good season and proper manner, and for not clearing off timber and repairing fences, as he had stipulated to do. So, also, in *Miller* v. *Gaither*, 3 Bush (Ky.), 152, where Gaither purchased a slave for the purpose of being put in the army as a substitute, who was rejected because unsuitable for the service.

The peculiar features of the case of *Van Epps* v. *Harrison*, 5 Hill (N. Y.), 63, 65, 66, and the observation of the learned Judge Ruggles, as to the measure of damages, are especially instructive. The misrepresentation was, that the parcel of land — forty-three acres, opposite the city of Albany — was well situated for building-lots in a city or village (proposed to be laid out) ; that the land was " entirely smooth and level," and " would not require any grading." An extravagant price was agreed to be paid for the property as the site of a town. For such purposes it turned out to be a wild and visionary speculation common to the times (1836). Several years afterwards (when sobriety in business transactions had returned) the case was before the Supreme Court, which felt embarrassed how to adjust an abatement of the price on account of the misrepresentation. The court said that " the defendant must bear the consequences of the prevailing delusion about prices and

new towns under which the purchase was made;" that the cause must be tried, as far as practicable, as if the question had arisen at the time; and that the damages must be assessed on the postulate of the belief at the time that the site was valuable for a town, by ascertaining how much less the land was worth for building purposes, taking the surface as it actually existed (very uneven and hilly), than it would have been worth for those purposes had the plaintiff's representations been true. It was then suggested that the amount might be ascertained by estimating the cost of reducing the surface to a condition corresponding with the representations.

Without pursuing further the examination of authorities, we refer to the cases cited by counsel in their briefs. A generalization of the cases would, perhaps, range them in two classes: first, those which find a complete indemnity for the injury, by a consideration of the consequences which naturally and proximately ensue; and, secondly, those which, in addition, take account of other and more collateral matters, such as the use to which the property is to be put, and special losses because of unfitness. The case of *Borradaile* v. *Brunton*, 8 Taunt. 535, is an apt exemplification of the last class. The cable chain sold was warranted to last two years. Within the time, one of the links broke, while the ship was at a dangerous anchorage at the mouth of the Ganges, in consequence of which the pilot slipped the anchor and stood out to sea, for the safety of the ship and cargo. The plaintiff recovered for the value not only of the chain, but also of the *anchor*. The court treated the defendant as warranting the chain sufficient to hold the anchor, and it proved not sufficient to do so. To the same effect are *Langridge* v. *Levy*, 2 M. & W. 519, cited by counsel for the appellee; *Van Epps* v. *Harrison, ubi supra; Miller* v. *Gaither, ubi supra; Vicksburg Railroad* v. *Ragsdale, ubi supra; Cutler* v. *Close, ubi supra*. In such cases the parties contract with reference to the uses to which the thing is to be applied, and they must intend that the value shall be measured by its adaptability and fitness for such use.

Myers purchased the property, not for speculation, but for the production by cultivation of the usual crops of the country. Its comparative exemption from overflow, and the care and

expenditure necessary to its protection, were important elements of value. Looked at in the light of the years subsequent to the purchase, it is evident that the price was high, if the land had been as it was represented to be. The negotiation was on the predicate that the plantation was safe from overflow, except a few acres, in high and long-continued floods, if the Vick front levee stood. It has turned out, however, that this levee does not afford adequate protection. If the land were put in the condition of safety that Myers expected and bargained for, — as by the erection of a levee in the rear, if that be practicable, and an enlargement of that on Lake Bolivar, — then, to a large extent, he would be indemnified. The cost of such erections might be estimated, as was the cost of grading the rough hills in *Van Epps* v. *Harrison, ubi supra.* But a simpler method, and one that received approval in the case cited in Alabama, would be to estimate what reduction in the value of the land, on account of the falsity of the vendor's representations, should be made from the contract price.

We must assume, as the basis of the adjustment, that the property was of the value agreed, if of the character warranted. The experience of the two or three years subsequent to the date of the contract serves to show the falsity of the representation. This subsequent knowledge must be carried back to or near the date of the contract, and in its light, treated as a factor, the sum figured out, and the result reached of the deduction to be made.

As shown in the testimony, an overflow does not generally prevent altogether the production of a crop. The rise of the river is annual, and occurs in the latter part of the winter and in the spring. The floods generally subside early enough to plant and produce a crop of cotton; not (except in rare instances) a crop of full or average yield. It was also shown that this plantation was not liable to annual overflows: it happened once in three, four or five years. These are important circumstances to be considered.

In cases like this the damages must not be guessed at; but the amount must be gathered by a careful analysis of substantial data. The judicial mind must seize upon the solid facts, and draw its conclusion from them. Important and pertinent

considerations are, whether, according to the experience of the past, an overflow comes every third, fourth or fifth year (that is, from other directions than the Vick front, for there was no warranty of that); and, then, whether such overflow extends to one-fourth, one-half, or how much of the plantation? How long does the overflow continue; does it ordinarily subside in time to plant a crop; how much is the yield lessened by the late planting; and what other serious injury is done? The range of the inquiry should include the extent of interruption in the production of crops, as whether one year in three, four or five; and then the extent and duration of overflows, whether partial or total; and the difference ordinarily in the yield of a crop planted after and before the overflow. Then comes the summing up, in view of all the facts, — viz., that the plantation is reduced in value from the agreed price, one-third, or one-fourth, or whatever it may be.

In view of all the circumstances, the valuation made by Myers would not vary far from our impressions of what would be a fair recoupment, — that is, a little over one-third of the contract price of the land. Myers, in his letters to Estell written before the litigation began, said, that on account of the change in the times, and depreciation of property, the plantation was not worth as much as when he bought it. In his deposition taken in 1870, he valued the plantation *then* at $42,000. If it was worth as much in 1865–66, we have data upon which we can work out a reasonably satisfactory result. It does not definitely appear at which figure the mules, stock and other effects were valued, — that, however, can be readily ascertained. Suppose the personalty worth $7,000, and we should have the entire estimated value of the property as $49,000. But the price agreed to be paid was $71,000; of which sum $31,000 has been paid. Deduct $49,000 from the $71,000, and we have a difference of $22,000, which would represent the damages to be recouped from the price of the land. Putting the figures in another form, we have nearly the same result. Value of land and personalty, $49,000, and, deducting payments in 1865–66, of $31,000, there remains a balance of $18,000.

But does the difference in the value of the land constitute

the entire sum of the damages? Myers embarked in the crop of 1867, trusting to the truth of Estell's statements. He was putting the land to the use for which he bought it. In the venture he lost cattle, sheep and two mules by drowning. The number and value are enumerated in his deposition. There may have been depreciation in value of those that survived, on account of confinement. Logs and drift were deposited upon the fields, and fences were washed away. It would be equitable and just that Myers should be compensated for these losses and expenses, because he entered upon the crop without experience of unusually high water, and in the confidence that Estell's representations were true. But such injuries and losses could not be estimated for any subsequent years; for, after he had acquired this experience, and had elected to abide by his purchase, his planting operations should be at his own risk, and not at Estell's.

The proof is direct that 1867 was a disastrous year for planting, — a year of loss and not of profit to those who escaped the overflow. After the subsidence of the water, Myers planted a crop and gathered about seventy bales, notwithstanding the ravages of the cutworm. But if Myers chooses to present further testimony as to any damages and losses in respect of the crop of that year, he may be at liberty to do so. The water, it will be borne in mind, poured through the Vick break after the plantation was already largely submerged. The break in that levee, as we understand the proof, would of itself have caused the entire overflow. The inquiry will be directed to the extent of damage to the crop in view of all the circumstances, because of the breach of warranty. It will be legitimate and pertinent to inquire into the nature and character of the season, and its effects upon the crop of that year in that region of country.

Within the just range of the principles we have laid down, Myers would also be entitled to compensation for the mules that died of disease without his fault or negligence, if it shall be shown that the disease is directly to be traced to the overflow of the plantation, rather than to atmospheric or other causes referable to the general overflow of the country. Testimony may be taken on that point.

We are unable to discover any rule or principle by which the Chancellor reached the conclusion that the damages amounted to $48,900, unless he adventured upon the dangerous and uncertain ground of the probable profits of the crops which might have been realized if there had been no overflows. We have made the calculation and figures on the estimated value by Myers, not for the purpose of adopting that as the true value and affording the data for a recoupment, but rather to set forth the considerations and method which should guide in the solution of this most difficult problem. In such cases, after the most careful investigation, nothing more can be expected to be attained than approximate justice.

Myers should have a recoupment from the price of the land on account of the deceit. He should also be allowed for losses by the drowning of stock during the overflow of 1867, and for the expenses of restoring his plantation to its former condition, in the removal of logs and the restoration of fences. Compensation for these things, and the difference in the value of the land as it turned out to be, compared with the agreed price for it as it was represented to be, are, it seems to us, the surest and safest data to proceed upon, and will mete out justice to the parties.

*Decree reversed and cause remanded.*

Each party filed a petition for reargument, which was granted by the present court, and before them the reargument was had, the discussion being confined to two questions : —

1. Should damages be allowed further than the difference between the value of the land as represented and as it actually proved to be ?

2. If so allowed, what items should be embraced ?

*W. L. Nugent*, for the appellant, made an oral argument, and filed a brief, citing 18 N. Y. 489 ; 47 Miss. 16 ; *Goodwin* v. *Morse*, 9 Met. 278 ; 16 Ala. 785 ; *Holley* v. *Younge*, 27 Ala. 203 ; *Foster* v. *Rogers*, 27 Ala. 602 ; *Gibson* v. *Marquis*, 29 Ala. 668 ; *Masterton* v. *Mayor of Brooklyn*, 7 Hill (N. Y.), 61 ; *Van Epps* v. *Harrison*, 5 Hill (N. Y.), 63 ; *Schooner Lively*, 1 Gallison, 315.

*Harris & George*, for the appellee, cited *Milburn* v. *Belloni*, 39 N. Y. 53 ; *Page* v. *Pavey*, 8 Carr. & Payne, 769 ; *Hitchcock*

v. *Hunt*, 28 Conn. 343; *Masterton* v. *Mayor of Brooklyn*, 7 Hill (N. Y.), 61; *Shepherd* v. *Milwaukee Gaslight Co.*, 15 Wis. 318; *Philadelphia Railroad* v. *Howard*, 13 How. (U. S.) 307; *Fox* v. *Harding*, 7 Cushing, 522; *Waters* v. *Powers*, 20 Eng. L. & Eq. 410; *Hadley* v. *Baxendale*, 9 Exch. 341; *Fletcher* v. *Taylor*, 17 C. B. 21; *Alder* v. *Keighley*, 15 M. & W. 117; *Thompson* v. *Jackson*, 14 B. Mon. 114; *Davis* v. *Talcott*, 14 Barb. 611; *Sewall's Falls Bridge* v. *Fisk*, 3 Foster (N. H.), 171; *Wade* v. *Leroy*, 20 How. (U. S.) 34; *Aiken* v. *Western Railroad*, 20 N. Y. 370; 9 Wend. 325; 29 E. C. L. 336; *Griffin* v. *Colver*, 16 N. Y. 489; *Houston* v. *Young*, 7 Ind. 200; *Edwards* v. *Edwards*, 31 Ill. 474; *Johnson* v. *Courts*, 3 Har. & Johns. 510; *McAffee* v. *Crofford*, 13 How. (U. S.) 447; *Passinger* v. *Thorburn*, 34 N. Y. 634; *Brown* v. *Edgarton*, 2 M. & Gr. 279; 40 E. C. L. 601; *Sneed* v. *Ford*, 107 E. C. L. 612; 20 Wis. 392; *Wolcott* v. *Mount*, 39 N. J. 262; *Randall* v. *Raper*, El. Bl. & El. 84; Benjamin on Sales, 686; *Hoy* v. *Grenoble*, 34 Penn. St. 9; *Mullett* v. *Mason*, L. R. 1 C. P. 563; L. R. 2 Exch. 67; L. R. 7 Exch. 96; *Cory* v. *Thames Iron Works*, L. R. 3 Q. B. 181; *Dempsey* v. *Hertzfield*, 30 Ga. 866; *Davis* v. *Talcott*, 14 Barb. 611; *Culver* v. *Avery*, 7 Wend. 380; *McNair* v. *Compton*, 35 Penn. St. 23; *Sharon* v. *Mosher*, 17 Barb. 518; *Vicksburg Railroad* v. *Ragsdale*, 46 Miss. 458; *Myers* v. *Estell*, 47 Miss. 4.

*J. Z. George*, on the same side, argued the case orally.

SIMRALL, C. J., delivered the opinion of the court.

Two questions were submitted for reargument. First, On what rule are the damages to be computed? Second, What items are to be taken into consideration?

It was fully conceded that the difference between the value of the land, if it had been as represented, and its actual value, must be allowed. That injury flows directly from the deceit. The argument at the bar was addressed mainly to the point, whether allowance should be made to Myers for the loss of the crop of 1867. The opinion delivered at the last term confined the inquiry to the crop of that year, for the reason that Myers had then discovered the falsity of the representations, and could not continue the cultivation from year to year

at Estell's risk, and hold him responsible for the results. The counsel for the appellee does not controvert that conclusion.

It is contended for Estell that, when Myers has deducted from the price the difference in the value of the land, he has been compensated for all the damages that ensue proximately and naturally from the deceit, and that the loss of the crop is too remote; and the value of it is so indefinite and uncertain that it must be rejected as an element in the estimate.

It may be premised that the only difference between damages claimed by the defendant for breach of a contract or a fraudulent act in recoupment of the plaintiff's demand, and damages claimed in a direct suit for the breach or the fraudulent act, is, that in the former case, however much they may exceed the plaintiff's demand, there is no recovery over for the excess, — they stop at the point when they equal the demand, and thereby become a satisfaction of it. Myers is entitled, therefore, in this suit to all the damages he might justly recover in an original action brought by him for the deceit, and the range of investigation and of evidence is as broad in the one case as the other. His rights are subject to the single limitation that he cannot have a decree against Estell for any proved excess.

Estell, who had lived for thirty years in Bolivar County, was familiar with the alluvial lands of the river delta, and their liability to overflow, and upon this subject was trusted by Myers. In the confidence that the plantation was comparatively free from liability to overflow, he agreed to give a very round price. Indeed, that constituted largely its value. He purchased the property, not on speculation or for resale, but for cultivation in the usual crops of cotton, corn, &c. If after the purchase Myers had become well satisfied from information that Estell's representations were untrue, and had declined to plant a crop, but had at once brought an action for the deceit, he could have recovered no more damages than the difference between the value of the land as represented and its real value.

Trusting, however, to the truth of Estell's statements, he put the property to the use for which he bought it, which was

well understood by both parties, and lost by the overflow his crop in part, and cattle by drowning, &c.

In generalizing into formula of rules or principles the lessons taught by the adjudications on this subject, in *Vicksburg Railroad* v. *Ragsdale*, 46 Miss. 458, one classification included damages arising from the unfitness of the thing sold for the use to which it was to be put by the buyer. If the seller was advised of such use, and warranted its adaptability for it, then it may fairly be said that he contemplated responsibility for the damages consequent on unfitness. The reason can be made plain by illustration: If a man buys cotton to sell again, he would be compensated for non-delivery or inexcusable delay in delivery by an allowance for the enhanced price. But if a manufacturer buys cotton to be wrought into yarns and cloths, and the seller, knowing of the use and of the necessity of prompt delivery, fails to deliver, or delays beyond the time, he would be responsible for idle hands and losses of that sort. A mere enhancement in price would be but an insignificant element in the damages: they might equal or exceed the price of the commodity. The case cited in the opinion, of the farmer who was to get a machine in time to thrash his grain, is another illustration. The manufacturer was held answerable for the expense of stacking the grain, and damages for wet weather, because these were referable to his delay.

In measuring damages, the form of the action is not so material as the nature of the injury complained of. In *Scott* v. *Shepherd*, 2 W. Black. 892, much debated as to the form of the action, the boy who lighted the squib and threw it in a public place, which, being thrown about in self-defence, struck the plaintiff in the face, and so burned one of his eyes until he lost the sight of it, was held liable, because of the *natural* and *probable consequence* of injury to somebody. So, too, in assumpsit against a schoolmaster for breach of his duty and undertaking to the parent of an infant pupil under his care, he was held answerable for the consequences of permitting the pupil to use fireworks. *King* v. *Ford*, 1 Stark. 421. In *Guille* v. *Swan*, 19 Johns. 381, an æronaut who descended in his balloon into the plaintiff's garden, and became entangled in the shrubbery, so that he was in a perilous situation, was

held liable for injuries to the plaintiff's property caused by a crowd, which, attracted by curiosity or the cries of the æronaut, broke down the garden fence and trod down the plaintiff's vegetables.

In *Vandenburgh* v. *Truax*, 4 Denio, 464, the defendant was in combat with a boy, and pursued him with a pickaxe into the plaintiff's store. The boy, in making his escape, ran behind the counter and knocked out the faucet from a cask, whereby about two gallons of the liquor was lost. The defendant was held liable to the merchant for the value of the liquor. These cases rest on the principle that the doer of a tortious act must respond to all the natural and probable consequences that flow from it. In *Edwards* v. *Edwards*, 31 Ill. 474, 478, the suit was on an injunction bond which restrained the plaintiff from taking possession of a farm. The writ was served in the spring and dissolved in October. The defendant sought to confine the damages to the rent of the land; but the court proceeded on the idea that the plaintiff must have complete redress for the wrong, and allowed proof of the value of the crops which he could have made.

Alike to this in principle are the cases of *Page* v. *Pavey*, 8 Carr. & Payne, 769; *Jones* v. *Bright*, 5 Bing. 533; *Borradaile* v. *Brunton*, 8 Taunt. 535; *Brown* v. *Edgington*, 2 Man. & Gr. 279; and many others. These are of the class where the subject of the sale was for a special use. The first was of a certain sort of wheat for seed; being defective, they did not come up. In a suit on the warranty, the plaintiff was permitted to offer testimony of the value of what the crop might have been. In the last case the rope was for a crane, to be used in hoisting up and letting down casks of wine. The rope broke, whereby the plaintiff lost a pipe of wine. The defendant was charged with the value of the wine.

Another case of the same class is *Randall* v. *Raper*, El. Bl. & El. 84. The defendant warranted barley-seed to be of a certain sort, but delivered seed of an inferior kind. The purchaser sold the seed to farmers, his customers, with the like warranty, who sowed them, producing crops inferior in value by £261. Reclamation was made by the farmers on their seller, who agreed to satisfy them. In an action on the

original warranty, Lord Campbell said he was clear that if the plaintiff had paid these £261 to his vendees, being compelled to do so for his breach of warranty, which was similar to that of the defendant to him, he could recover such damages in this action.   Another judge said, the natural consequence of such barley being sowed is that an inferior crop will be produced.   The damages naturally result from the breach of warranty.   *Borradaile* v. *Brunton, ubi supra,* belongs to the same class.   The doctrine of these cases is that the sellers knew to what use the several articles were to be put, and by their warranties affirmed that they were fit for those uses.   The cost of the wheat and barley seed and of the ropes bore no comparison to the amount of damages really sustained and allowed.

Is the rule different when land is the subject of sale, — where, in the intendment of buyer and seller, it is to be used for a particular purpose ?   If the inducement to the purchase is that the land contains coal or other mineral, and it turns out that the purchaser expended money in the proper tools for mining and in paying laborers, on the faith of the vendor's warranty, why are not these outlays as legitimate elements of damages as the reduced value of the land itself because of the deceit ?   They are as intimately associated and connected with the warranty as is the loss of the crop from bad seed, or its lessened value from inferior seed, or the loss of the wine or the anchor from the unfit rope and chain.   Can a distinction be pointed out between a sale of land with such warranty as Estell made and these cases ?   The wine and the anchor were lost in the very use of the rope and the chain.   It is equally true that the crop was lost by the cause warranted against; while the land was employed in the very use for which it was bought.   There was no harvest, because there was no germinating property in the seed.   There was but little crop produced, because the overflow submerged the land.   In the one case the seed was warranted sound ; in the other, the representation was that the floods would not drown out the seed: Each in attempting to utilize the thing bought lost the crop in whole or in part.   Both made their several ventures on the faith and assurance of the respective vendors.   Each sustained his loss in demonstrating the untruth of the assurances on

which he relied. The sound principle which pervades the reasoning and justifies the conclusion is that the purchasers had no experience and had made no tests of the adaptability of the several things for the uses designed, — as to that, they trusted the sellers; but, in making available these things, they adventured money or other valuable things, and, because of the worthlessness of the articles for the purpose, these other valuables were lost. The wine-cask and the anchor were intrusted to the strength of the rope and chain; the land is confided to the seed. The loss in each case is referred back to an efficient cause, against which the sellers took the risk and agreed to indemnify.

But if there be fraud by the vendor, the damages take a wider range than if his conduct had been fair and honest. That principle was acted upon in *McNair* v. *Compton*, 35 Penn. St. 23, which was an action of covenant for failure of title to part of the land. The court said: "As against a fraudulent vendor, it is reasonable that damages should be given to compensate for all the expenses in which his fraud involved the plaintiff." The language had reference to actual fraud, as that the vendor knew that his title was worthless when he represented it to be good. It was conceded that if there had been no element of fraud, damages would be limited to the value of the land, the title to which had failed.

*Sharon* v. *Mosher*, 17 Barb. 518, was for a deceit in the sale of a mare. The seller represented the animal to be perfectly gentle and kind. Two days after the purchase the plaintiff attempted to drive the mare, when she commenced running and kicking. The buggy was broken, and the plaintiff, to save his life, jumped out and fractured his leg. The question was whether testimony should have been admitted as to the injury to the buggy, as to the nature and extent of injury to the leg, the length of the plaintiff's confinement and the expenses incurred in effecting a cure. The court held the testimony proper, on the ground that a party committing a wilful injury is "responsible for all the natural and *probable consequences* of his conduct."

In *Jeffrey* v. *Bigelow*, 13 Wend. 518, the defendant's agent sold diseased sheep to the plaintiff, whereby the disease was

spread into his flock.  The deceit lay in the concealment of the disease.  It was said by the court, The damage is not the mere difference in value between diseased and healthy sheep, but extends to the loss of the plaintiff's flock by communicating the contagious disease to them.  Such, also, is the rule of the civil law.

*McAffee* v. *Crofford*, 13 How. (U. S.) 457, illustrates how far the courts will go in compensating for a tortious act.  The trespass was for driving off the plaintiff's slaves.  Damages were allowed for a large quantity of cordwood which might have been hauled to the bank of the river and sold, but which was subsequently washed away by the flood ; and also for the partial loss of crop, from the depredations of stock breaking into the enclosure.  With plausibility it might be said that the proximate cause of the loss of the cordwood was the overflow, and of the crop, the depredations of the stock ; but the court referred both losses to the wrongful act of the defendant.  The driving off of the slaves broke up the scheme of marketing the cordwood, and making the crop.

A careful reconsideration of the subject on reason and authority has brought us to the conclusion on the main question reached on the former hearing ; viz., that Myers may recoup in damages, first, the difference in the value of the land.  Second, For the deficit, or partial loss of the crop of 1867, by reason of the overflow, reference being had to the character of the season, climatic influences and other circumstances that affected the production.  Third, For the drowning of cattle and animals by reason of the overflow, if by reasonable efforts Myers could not have saved them.  Fourth, For the expense of replacing fences washed away, and removing drift and logs from the fields, except so far as these injuries may have been caused by the breaking of the Vick front levee, and provided not estimated for in the first item.

*Judgment reversed and cause remanded.*